5\7

R. KEITH ROARK, ISB No. 2230
Keith@roarklaw.com
THE ROARK LAW FIRM, LLP
409 N. Main St.
Hailey, ID 83333
(208) 788-2427
Fax: (208) 788-3918

CYNTHIA WOOLLEY, ISB No. 6018
Cynthia@ketchumidaholaw.com
WOOLLEY & POGUE, PLLC
P.O. Box 6999
180 First St. West, Suite 107
Ketchum, ID 83340
(208) 725-5356
Fax: (208) 725-5569

KATHLEEN J. ELLIOTT, ISB No. 4359
kje@hampton-elliott.com
TERESA A. HAMPTON, ISB No. 4364
tah@hampton-elliott.com
HAMPTON & ELLIOTT
912 North 8th Street
Boise, ID 83302
(208) 384-5456
Fax: (208) 384-5476

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ABDULLAH AL-KIDD,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO GONZALES, Attorney General of the United States; JOHN ASHCROFT, Former Attorney General of the United States; ROBERT MUELLER, Director of the Federal Bureau of Investigation; MICHAEL CHERTOFF, Secretary of the Department of Homeland Security and Former Assistant Attorney General of the Department of Justice; JAMES DUNNING, Warden, Alexandria Detention Center; | CASE NO. ___<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

COMPLAINT - 1

DENNIS M. CALLAHAN, Warden,
Oklahoma Federal Transfer Center;
VAUGHN KILLEEN, former Warden, Ada County Jail;
FBI Agents MICHAEL JAMES GNECKOW,
SCOTT MACE; UNITED STATES
DEPARTMENT OF JUSTICE; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
FEDERAL BUREAU OF INVESTIGATION;
TERRORIST SCREENING CENTER;
DONNA BUCELLA, Director of the Terrorist
Screening Center; JOHN DOES 1-25,

Defendants.

Plaintiff Abdullah al-Kidd, through counsel, hereby complains and alleges the following:

## INTRODUCTION

1. Abdullah al-Kidd, a United States Citizen born in Wichita, Kansas, was unlawfully arrested and detained as a material witness in March 2003. For 15 days he was detained and treated not as a witness, but as a terrorist suspect. Among other things, he was held in 24-hour lockdown in maximum-security facilities; transported between three different prisons in three different states, bound each time in wrist, arm and waist shackles; and singled out and forced to sit naked in a public holding cell for hours in front of dozens of clothed inmates and guards, at least one of whom was female. Even after he was released, his freedom was severely curtailed by excessive and unreasonable restrictions on his movement. In the end, the government did not even bother to call Mr. al-Kidd as a witness.

2. Mr. al-Kidd now brings this action against various federal and state officials and agencies to vindicate his right to be free from unlawful and arbitrary arrest and detention. He seeks declaratory and injunctive relief as well as damages.

**JURISDICTION AND VENUE**

3. This case is brought pursuant to, *inter alia*, the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

4. Venue is proper in the District of Idaho because a substantial part of the events complained of giving rise to Plaintiff's claim occurred in this District. 28 U.S.C. §§ 1391(b), 1391(e).

**PARTIES**

5. Plaintiff ABDULLAH AL-KIDD is a United States citizen living in Las Vegas, Nevada.

6. Defendant ALBERTO GONZALES is the Attorney General of the United States of America. As Attorney General, he has ultimate responsibility for the United States Department of Justice and the Federal Bureau of Investigation, the Bureau of Prisons and the United States Marshals Service. In this capacity, Defendant Gonzales has responsibility for administering the material witness statute, and also has oversight of various databases that contain and disseminate arrest and detention records. Defendant Gonzales is the successor to John Ashcroft, who served as Attorney General of the United States until November 9, 2004. Defendant Gonzales is sued in his official capacity.

7. Defendant JOHN ASHCROFT was the Attorney General of the United States of America from February 1, 2001 to November 9, 2004, and at the time Mr. al-Kidd was arrested and confined. In this capacity, Defendant Ashcroft had responsibility for administering the material witness statute, and also had responsibility for the maintenance and operation of various

COMPLAINT - 3

databases that contain and disseminate arrest and detention records. Defendant Ashcroft is sued in his individual capacity.

8. Defendant ROBERT MUELLER is the Director of the Federal Bureau of Investigation. As Director, he has responsibility for administering the material witness statute and also has responsibility for the maintenance and operation of various databases that contain and disseminate arrest and detention records. Defendant Mueller is sued in his official capacity.

9. MICHAEL CHERTOFF is the current Secretary of the Department of Homeland Security. As the Secretary of Homeland Security, he has responsibility for the maintenance and operation of various databases that contain and disseminate arrest and detention records. As Secretary of Homeland Security, Defendant Chertoff is sued in his official capacity. Defendant Chertoff was also the former Assistant Attorney General for the Criminal Division of the Department of Justice from May 9, 2001 to June 9, 2003, and occupied this position at the time Mr. al-Kidd was arrested and detained. While Assistant Attorney General, Defendant Chertoff had responsibility for overseeing the implementation and administration of the material witness statute. As the former Assistant Attorney General, Defendant Chertoff is sued in his individual capacity.

10. Defendant SCOTT MACE was the FBI agent who prepared and signed the affidavit submitted in support of the application to arrest Mr. al-Kidd as a material witness ("affidavit"). Defendant Mace is sued in his individual capacity.

11. Defendant MICHAEL JAMES GNECKOW was an FBI agent at the time Mr. al-Kidd was arrested and detained. According to the affidavit submitted in support of the material witness application in Mr. al-Kidd's case, Defendant Gneckow provided Defendant Mace with some of the facts used in the affidavit. Defendant Gneckow is sued in his individual capacity.

12. Defendant JAMES DUNNING, at all relevant times to this complaint, was the Warden for the Alexandria Detention Center. While Warden, Defendant Dunning had responsibility for the conditions under which Mr. al-Kidd was confined. While Warden, Defendant Dunning subjected Mr. al-Kidd to unreasonable and excessively harsh conditions in violation of the Constitution and federal statutes. Defendant Dunning is sued in his individual capacity.

13. Defendant DENNIS M. CALLAHAN, at all relevant times to this complaint, was the Warden for the Oklahoma Federal Transfer Center. While Warden, Defendant Callahan had responsibility for the conditions under which Mr. al-Kidd was confined. While Warden, Defendant Callahan subjected Mr. al-Kidd to unreasonable and excessively harsh conditions in violation of the Constitution and federal statutes. Defendant Callahan is sued in his individual capacity.

14. Defendant VAUGHN KILLEEN, at all relevant times to this complaint, was the Warden for the Ada County Jail. While Warden, Defendant Killeen had responsibility for the conditions under which Mr. al-Kidd was confined. While Warden, Defendant Killeen subjected Mr. al-Kidd to unreasonable and excessively harsh conditions in violation of the Constitution and federal statutes. Defendant Killeen is sued in his individual capacity.

15. Defendant UNITED STATES DEPARTMENT OF JUSTICE ("DOJ") is a federal agency authorized by statute to arrest material witnesses, impose conditions of confinement on material witnesses, and to administer and maintain various databases containing and disseminating arrest and detention records and other information.

16. Defendant UNITED STATES DEPARTMENT OF HOMELAND SECURITY ("DHS") is a federal agency that also operates and maintains federal databases that contain and disseminate arrest, detention, and other homeland-security related records.

17. Defendant FEDERAL BUREAU OF INVESTIGATION ("FBI") is the agency within DOJ responsible for gathering intelligence for material witness and criminal proceedings, and administering certain databases that contain and disseminate detention, arrest, and other records.

18. Defendant TERRORIST SCREENING CENTER is a multi-agency program established by Homeland Security Presidential Directive 6 and housed within the FBI to centralize foreign and domestic intelligence, criminal information, and homeland security data for dissemination to law enforcement officials and others.

19. Defendant DONNA BUCELLA is the Director of the Terrorist Screening Center and has ultimate responsibility for the Center's actions, including the maintenance and dissemination of arrest, detention, and other records relating to terrorism investigations. Defendant Bucella is sued in her individual capacity.

20. Plaintiff is unaware of the true names and capacities, whether individual or otherwise, of Defendants DOES 1 through 25, inclusive, and therefore sues those defendants by fictitious names. Plaintiff is informed and believes, and on that basis alleges, that these DOE defendants, and each of them, are in some manner responsible and liable for the acts and/or damages alleged in this Complaint, and that among these DOE defendants are supervisory employees and federal and state agents who acted under color of law. Plaintiff will amend this Complaint to allege the DOE defendants' true names and capacities when they have been ascertained.

**JURY DEMAND**

21. Plaintiff demands a trial by jury in this action on each of his claims triable by jury.

**FACTS**

**The Material Witness Warrant**

22. On February 13, 2003, an Indictment was filed in the United States District Court for the District of Idaho in the case of Sami Omar Al Hussayen, a graduate student at the University of Idaho. The Indictment alleged that Mr. Al Hussayen had committed visa fraud and had made false statements to United States officials.

23. Approximately one month later, on March 14, 2003, the United States Attorney's Office submitted an application in the United States District Court for the District of Idaho for the arrest of Plaintiff Abdullah al-Kidd as a material witness. According to the government, Mr. al-Kidd had information germane to Mr. Al Hussayen's criminal trial, which was not scheduled to begin for more than a year.

24. United States Magistrate Judge Mikel Williams for the District of Idaho approved the application and issued the material arrest warrant for Mr. al-Kidd on March 14, 2003, the same day as the government's request.

25. The government sought the arrest warrant for Mr. al-Kidd pursuant to 28 U.S.C. § 3144 (the federal material witness statute). Under the statute, the federal government is authorized to arrest and detain an individual who has not been charged with a crime and is sought only as a witness in a criminal proceeding. But this extraordinary power is carefully circumscribed and can only be exercised under narrow circumstances.

26. To secure a material witness warrant, the government must demonstrate probable cause to believe that the witness has information relevant to a criminal proceeding and that the testimony could not be secured without an arrest. *See* 28 U.S.C. § 3144.

27. Even where these statutory conditions are satisfied, the government must, if possible, depose a material witness and release him from custody.

28. Even if a material witness is not amenable to subpoena, and even if a deposition of that person would not suffice, the government must impose the least restrictive constraints possible on such a person sufficient to insure his presence at trial.

29. The material witness application submitted by the United States Attorney in Idaho for Mr. al-Kidd's arrest was based on a single affidavit, executed by FBI agent Mace. The affidavit stated that Agent Mace relied on facts acquired and supplied by FBI agent Gneckow and other law enforcement officials. Both Agents Mace and Gneckow are defendants in this action.

30. The 3-page affidavit consisted of only one substantive paragraph pertaining to whether Mr. al-Kidd's testimony could be secured voluntarily, without the need for an arrest. The affidavit likewise contained only one substantive paragraph pertaining to whether Mr. al-Kidd had information that was material to Mr. Al Hussayen's criminal proceeding.

31. The single substantive paragraph addressing whether Mr. al-Kidd's testimony could have been secured without the need for an arrest stated only that:

> Kidd is scheduled to take a one-way, first class flight (costing approximately $5,000.00) to Saudi Arabia on Sunday, March 16, 2003, at approximately 6:00 EST. He is scheduled to fly from Dulles International Airport to JFK International Airport in New York and then to Saudi Arabia.

Affidavit at ¶ 7 (application and affidavit attached as Exhibit "A"); *id.* at ¶ 8 (offering the one-line conclusion that "[i]t is believed that if Al-Kidd travels to Saudi Arabia, the United States Government will be unable to secure his presence at trial via subpoena").

32.  The affidavit, on its face, failed to establish probable cause that Mr. al-Kidd's testimony could not be secured voluntarily or by subpoena.

33.  Defendants Mace and Gneckow knew or reasonably should have known that the affidavit failed to establish probable cause that Mr. al-Kidd would decline to testify voluntarily, without arrest.

34.  Defendants Mace and Gneckow knew or reasonably should have known that there was not in fact probable cause to believe that Mr. al-Kidd would decline to testify voluntarily, without arrest.

35.  Furthermore, the affidavit contained false and misleading information.  Mr. al-Kidd had a round-trip ticket, not a one-way ticket, as wrongfully alleged in the affidavit.

36.  Defendants Mace and Gneckow knew or reasonably should have known that the affidavit contained false and misleading information.

37.  Defendants Mace and Gneckow acted intentionally, knowingly, and/or with deliberate indifference in submitting a false and misleading affidavit in support of the warrant.

38.  Upon information and belief, Magistrate Judge Williams would not have signed the material arrest warrant against Mr. al-Kidd had he known that the affidavit contained false and/or misleading information.

39.  The affidavit also omitted critical information that was directly material to whether there was probable cause to believe that Mr. al-Kidd's testimony could be secured only by his arrest.

40. Among other things, the affidavit did not inform the Court that: Mr. al-Kidd had made himself available and fully cooperated with the FBI on at least three prior occasions and sat for extensive interviews on these occasions; that in these prior interviews Mr. al-Kidd was forthcoming; that Mr. al-Kidd was a United States citizen born in 1972 in Kansas; that his mother and father are United States citizens and were living in the United States; that he was a father and husband and that his wife and two children lived in the United States; that he had strong community ties as a long-term social worker; that he attended the University of Idaho on a football scholarship; and that after graduating he remained in Idaho and engaged in extensive charitable and social work in the community.

41. Defendants Mace and Gneckow were aware of, or reasonably should have been aware of, the foregoing facts omitted from the affidavit.

42. Defendants Mace and Gneckow acted intentionally, knowingly, and/or with deliberate indifference in submitting an affidavit that omitted critical facts relevant to whether there was probable cause to believe Mr. al-Kidd would have testified voluntarily, without arrest.

43. Mr. al-Kidd's trip to Saudi Arabia was for the purpose of language and religious study. At no time did Defendants Mace or Gneckow, or any other official of the United States, tell Mr. al-Kidd that he should consult with the government before he scheduled a trip abroad.

44. At no time did Defendants Mace or Gneckow, or any other official of the United States, contact Mr. al-Kidd to inquire whether he would testify voluntarily, without the need for an arrest warrant. Similarly, at no time did Defendants Mace or Gneckow, or any other official of the United States, contact Mr. al-Kidd to ask whether he would postpone his trip to Saudi Arabia.

45. Mr. al-Kidd would have voluntarily complied with a subpoena had he been issued one. Mr. al-Kidd would have voluntarily postponed or cancelled his study trip to Saudi Arabia had Agents Mace, Gneckow, or any other FBI agent so requested.

46. The affidavit submitted in support of the material arrest warrant was also invalid and unlawful on the separate and independent ground that it did not establish probable cause to believe that Mr. al-Kidd had information that was material to Al Hussayen's criminal proceeding.

47. Defendants Mace and Gneckow knew or reasonably should have known that the affidavit was materially misleading as to Mr. al-Kidd's relationship with Al Hussayen. Defendants Mace and Gneckow acted intentionally, knowingly, and/or with deliberate indifference to the misleading nature of the affidavit.

48. Among other things, the affidavit stated that Mr. al-Kidd had material information because he or his wife received payments from Al Hussayen "and his associates in excess of $20,000." In fact, defendants knew or reasonably should have known that Mr. al-Kidd worked for the same charitable Islamic organization as Mr. Al Hussayen and received a salary for assisting with English language classes, speaking engagements, and publishing English manuals on Islam for prisoners.

49. Without the misleading portions of the affidavit, the warrant application did not contain sufficient detail to establish that there was probable cause to believe that Mr. al-Kidd had testimony relevant to the trial of Al Hussayen. Even with the misleading portions, the affidavit still did not establish that there was probable cause to believe that Mr. al-Kidd would have relevant testimony.

50. Defendants Mace and Gneckow acted under color of law in preparing and executing the affidavit in support of the material witness application in Mr. al-Kidd's case.

51. Defendants Mace and Gneckow acted intentionally, knowingly, and/or with deliberate indifference to the constitutional and legal rights of Mr. al-Kidd.

52. Defendants Mace and Gneckow knew or reasonably should have known that the consequences of their actions would result in the unlawful arrest of Mr. al-Kidd, and would also subject Mr. al-Kidd to unreasonable and unlawful use of force, unconstitutional conditions of confinement, and to punishment without due process.

**Mr. al-Kidd's Arrest**

53. Two days after the warrant issued, on March 16, 2003, FBI agents arrested Mr. al-Kidd as a material witness pursuant to the March 14 warrant issued in Idaho; between the 14th and 16th of March, the government did not contact Mr. al-Kidd to ask whether he would voluntarily meet with the FBI, postpone his trip or relinquish his passport. Instead, FBI agents humiliatingly arrested and handcuffed him at the Dulles International Airport in Virginia shortly before his flight.

54. At the ticket counter, FBI agents confiscated his passport. Mr. al-Kidd informed the agents that he would cooperate. The agents did not inform Mr. al-Kidd of his right to a lawyer or provide him with a copy of the arrest warrant.

55. After his arrest at the ticket counter, the FBI agents walked Mr. al-Kidd in handcuffs through the airport, as onlookers stared at them. Mr. al-Kidd was then driven to a police substation near the airport, where he was placed in a holding cell alone.

56. After approximately one hour in the holding cell, the agents brought Mr. al-Kidd to an interrogation room, where he was informed that he did not have to talk, but that if he

cooperated the matter might be resolved and he could continue on his flight. Mr. al-Kidd agreed to talk and was interrogated at length. The agents questioned Mr. al-Kidd about his beliefs, conversion to Islam, and his travels. He repeatedly assured the government agents that he would testify in the trial if necessary and that he would make himself available for subpoena at any time that he was requested to do so.

57. After the interrogation, Mr. al-Kidd was taken back to the holding cell, where he was again handcuffed and taken to the Alexandria Detention Center in Virginia.

## Detention Conditions

58. Mr. al-Kidd was ultimately detained for 15 days, until his release in Boise on March 31, 2003. During this time, he was held in three different facilities: the Alexandria Detention Center in Virginia, the Federal Transfer Center in Oklahoma, and the Ada County Jail in Boise, Idaho. In each facility, he was treated as if he were a terrorist suspect, rather than a witness, and subjected to humiliating, punitive and excessively harsh conditions and restrictions on his liberty.

59. When Mr. al-Kidd was transferred between detention centers, Mr. al-Kidd was treated as if he were a terrorist suspect, rather than a witness, and subjected to humiliating, punitive and excessively harsh conditions and restrictions on his liberty.

## Alexandria Detention Center

60. At the Alexandria Detention Center in Virginia (his first stop), he was placed in the lockdown unit of the facility, in a small cell with one other inmate.

61. On March 17, 2003 Mr. al-Kidd was taken to the United States District Court for the Eastern District of Virginia, where the government moved to continue his detention without bond until he could be transferred to Idaho, which the government said would be done as quickly as possible. United States Magistrate Judge Liam O'Grady asked whether Mr. al-Kidd wanted to

have his detention hearing in the Eastern District of Virginia within the next three days or instead be transferred to Boise, Idaho for the hearing. The Magistrate Judge further advised Mr. al-Kidd that it might be in his interest to be transferred to Boise where people were more familiar with his case. Mr. al-Kidd expressed concern about how long it would take to have his hearing in Idaho. Without the aid of an attorney and feeling overwhelmed, Mr. al-Kidd agreed to be transferred to Boise on the assumption that the transfer would occur quickly.

62. Two days after his court appearance without counsel, on March 19, 2003, Mr. al-Kidd was removed from lockdown at the Alexandra facility and strip-searched. Mr. al-Kidd was then transferred to the maximum-security unit of the jail. Upon information and belief, Mr. al-Kidd was held in the same cell where John Walker Lindh and Zacarias Moussaoui, two individuals who have been charged with terrorist offenses by the United States, had been detained.

63. Mr. al-Kidd spent the next five days in the maximum-security unit of the Alexandria Detention Center, in solitary confinement, for 23-hours a day in a small cell called the "the hole."

64. Upon information and belief, many, if not most, of the other inmates in the maximum-security unit had been charged or convicted of serious crimes.

65. On March 24, 2003, eight days after his arrest, Mr. al-Kidd was taken to a processing room where employees of the U.S. Marshals Service handcuffed his hands and legs, chained his waist, and then linked his waist chain to a blue box on his hands, which was padlocked.

66. Agents of the Marshals Service then escorted Mr. al-Kidd in handcuffs, shackles, and chains to an airfield and onto a special "Conair" plane. He remained shackled for the entire trip

as he was transported, with approximately 100 other individuals, to the Federal Transfer Center in Oklahoma.

67. Upon information and belief, many of the individuals with whom he was transferred had been charged or convicted of serious offenses, including murder.

68. While Warden, and acting under color of law, Defendant Dunning had ultimate responsibility and oversight for the unlawful, excessive, and punitive manner in which Mr. al-Kidd was held in the Alexandria facility.

69. While Warden, Defendant Dunning knew or should have reasonably known that Mr. al-Kidd was being subjected to unlawful, excessive, and punitive detention conditions.

70. While Warden, Defendant Dunning acted intentionally, knowingly, and/or with deliberate indifference to the constitutional and legal rights of Mr. al-Kidd to be free from unlawful, excessive, and punitive detention conditions.

**Oklahoma Federal Transfer Center**

71. At the Oklahoma Federal Transfer Center, Mr. al-Kidd and the other detainees from the plane were brought to a small room. After waiting for approximately one and one-half hours, Mr. al-Kidd was ordered to remove his clothes in front of other detainees and sit in a cell alone, completely naked, in plain view of other inmates and guards, including at least one female guard. Other inmates were permitted to remain clothed and were processed. Mr. al-Kidd remained naked in his holding cell until every other detainee had been processed.

72. After all the inmates had been processed, Mr. al-Kidd was processed. He was then placed him in solitary confinement in the Special Housing Unit of the facility.

73. While Warden, and acting under color of law, Defendant Callahan had responsibility and oversight for the unlawful, excessive, and punitive manner in which Mr. al-Kidd was held in his facility.

74. While Warden, Defendant Callahan knew or should have reasonably known that Mr. al-Kidd was being subjected to unlawful, excessive, and punitive detention conditions.

75. While Warden, Defendant Callahan acted intentionally, knowingly, and/or with deliberate indifference to the constitutional and legal rights of Mr. al-Kidd to be free from unlawful, excessive, and punitive detention conditions.

## Ada County Jail

76. On March 25, 2003, employees of the U.S. Marshals Service again handcuffed, shackled, and chained Mr. al-Kidd, and transferred him to Boise, Idaho. Throughout the flight, he remained handcuffed, shackled, and chained. His request to use the bathroom on the plane was refused.

77. When Mr. al-Kidd arrived in Boise on March 25, he remained handcuffed, shackled, and chained while he was transferred to a holding cell in the United States District Court. Under the watch of an agent of the Marshals Service, Mr. al-Kidd met with a lawyer from the Federal Public Defender's office in Idaho for approximately ten minutes before he was scheduled to appear in court.

78. At the hearing, the government requested a three-day continuance and asked that Mr. al-Kidd's detention be continued without bail during that time, asserting that he poses a danger and that there was a risk he would flee. The Court ultimately granted a two-day continuance and scheduled a hearing for March 27. Employees of the U.S. Marshals Service then transported Mr. al-Kidd to Ada County Jail.

79. After being processed at the Ada County Jail, Mr. al-Kidd was constrained by ankle and waist chains, and his arms were latched to a waist chain preventing him from extending them. He was then taken to the maximum-security unit of the prison, where he was placed in solitary confinement, in a small glass cell referred to as the "fish bowl." Mr. al-Kidd spent the next five days in Ada County Jail.

80. While Warden, and acting under color of law, Defendant Killeen had responsibility and oversight for the unlawful, excessive, and punitive manner in which Mr. al-Kidd was held in his facility.

81. While Warden, Defendant Killeen knew or should have reasonably known that Mr. al-Kidd was being subjected to unlawful, excessive, and punitive detention conditions.

82. While Warden, Defendant Killeen acted intentionally, knowingly, and/or with deliberate indifference to the constitutional and legal rights of Mr. al-Kidd to be free from unlawful, excessive, and punitive detention conditions.

**Release Conditions**

83. On March 28, 2003, Defendant Gneckow and two United States Attorneys interviewed Mr. al-Kidd at the Ada County Detention Center in the presence an attorney from the Public Defender Service. For the next several hours, Mr. al-Kidd was again questioned about his conversion to Islam, his beliefs about Islam, his activities, travels and his associations with Al Hussayen.

84. During the meeting, Mr. al-Kidd repeated once again his willingness to cooperate and assured the government that he would make himself available for subpoena and appear at any time that he was requested to do so. He further promised that he would not leave the country. The government ultimately proposed that he be released only under strict conditions.

85. Sixteen days after his arrest, on March 31, 2003, the Court ordered Mr. al-Kidd released on conditions. The Court ordered Mr. al-Kidd released into the custody of his wife and that he live with her at her parents' home in Nevada. The Court confiscated his passport, barred him from applying for a new one and limited his travel to four states. He was required to report to a probation officer in Idaho weekly and an officer in Las Vegas monthly and subjected to home visits throughout his period of supervision.

86. For the next 441 days, Mr. al-Kidd lived under the conditions imposed by the Court.

87. After almost a year of living in his restrictive release conditions, Mr. al-Kidd's marriage began to fall apart. On March 22, 2004, Mr. al-Kidd filed a Motion for Modification of his release conditions at his in-laws' because his living conditions had become unbearable and he and his wife were separating. On March 31, 2004, the court modified the conditions to allow him to secure his own residence in Las Vegas, Nevada.

88. On June 10, 2004, a jury acquitted Sami Omar Al Hussayen on all the major charges and failed to reach a verdict on the remaining counts. The government never called Mr. al-Kidd to testify at the trial. The Court subsequently dismissed the material witness warrant, 15 months after Mr. al-Kidd was arrested.

**Post-September 11 Policy and Practice Regarding Material Witnesses**

89. In the aftermath of September 11, 2001, the United States government adopted a policy and/or practice of using the federal material witness statute in an unprecedented, unlawful, excessive and punitive manner. Under this policy and/or practice, individuals were arrested on material witness warrants without probable cause that they had information germane to a criminal proceeding or that their testimony could not be secured without the need for an arrest, and were unnecessarily detained for prolonged periods and in excessive and punitive conditions.

COMPLAINT - 18

Further, under this policy and/or practice, the material witness statute was used to hold suspects where the government had not established probable cause to arrest the individual for a crime. Under this policy and/or practice of preventive detention, many of the individuals arrested as material witnesses were either never called to testify and/or were later charged with a crime after being detained and interrogated, without Miranda warnings, for lengthy periods of time, sometimes weeks, or even months.

90.  Upon information and belief, most of the individuals subjected to this policy and/or practice were Muslim men.

91. Upon information and belief, while Attorney General, and acting under color of law, Defendant Ashcroft was a principal architect of, and set into motion, this unlawful and unprecedented policy and/or practice regarding the material witness statute, and had oversight responsibility for its implementation.

92. Upon information and belief, while an Assistant Attorney General, and acting under color of law, Defendant Chertoff was a principal architect of, and set into motion, this unlawful and unprecedented policy and/or practice regarding the material witness statute, and had oversight responsibility for its implementation.

93.  Defendants Ashcroft and Chertoff knew, or reasonably should have known, the unlawful, excessive, and punitive manner in which the federal material witness statute was being used in the aftermath of September 11, 2001.  Further, Defendants Ashcroft and Chertoff knew or reasonably should have known that the manner in which the material witness statute was being used would result in the unlawful arrest of Mr. al-Kidd, and would also subject Mr. al-Kidd to unreasonable and unlawful use of force, unconstitutional conditions of confinement, and to punishment without due process.

COMPLAINT - 19

94. Defendants Ashcroft and Chertoff, in creating, overseeing, and implementing this unlawful, excessive, and punitive policy and/or practice, acted intentionally, knowingly, and/or with deliberate indifference, towards the constitutional and legal rights of individuals arrested and detained under the policy and/or practice.

**Irreparable Harm Suffered by Mr. al-Kidd**

95. There is a real and actual controversy between Plaintiff and Defendants, and Defendants' actions are the proximate cause of Plaintiff's injuries.

96. Mr. al-Kidd has suffered and continues to suffer harm, including irreparable harm, as a direct result of the violations complained of herein, and that harm will continue unless declared unlawful and enjoined by this Court.

97. During this 15-month period, Mr. al-Kidd's marriage slowly unraveled and he ultimately separated from his wife. He was also unable to find steady employment after his life had been disrupted by the arrest. He was also deprived of the opportunity to study Islamic law and Arabic in Saudi Arabia on a scholarship.

98. As a result of his arrest, detention, and treatment during detention Mr. al-Kidd has experienced severe and lasting emotional and mental distress including but not limited to fear, anxiety, nervousness, stress, depression and humiliation.

99. Upon information and belief, Mr. al-Kidd has also faced, and will continue to face, adverse employment consequences because the government maintains and disseminates information and records about his arrest and detention as a material witness.

100. In July 2004, Mr. al-Kidd was fired from his job with a contractor who did work on a United States Army base, on information and belief, because he was denied a required security clearance. Upon information and belief, he did not receive the necessary clearance because of

the material arrest and other records maintained by defendants DOJ, FBI, DHS, and TSC in various databases and disseminated to Mr. al-Kidd's employers and others.

101. Upon information and belief, information and records concerning Mr. al-Kidd's material witness arrest and detention appear in several federal databases, including defendant FBI's National Crime Information Center database (NCIC) and the database operated by the Terrorist Screening Center (TSC).

## COUNT ONE

## VIOLATION OF THE BAIL REFORM ACT (18 U.S.C. § 3144)

102. The foregoing allegations are re-alleged and incorporated herein by reference.

103. Mr. al-Kidd's arrest, detention and post-detention release conditions violated the statute.

## COUNT TWO

## VIOLATION OF THE FOURTH AMENDMENT

104. The foregoing allegations are re-alleged and incorporated herein by reference.

105. Mr. al-Kidd's arrest and post-release conditions violated the Fourth Amendment of the United States Constitution.

## COUNT THREE

## VIOLATION OF THE FIFTH AMENDMENT

106. The foregoing allegations are re-alleged and incorporated herein by reference.

107. The arrest and conditions under which Mr. al-Kidd was detained violated the Fifth Amendment of the United States Constitution, as do the conditions governing his post-detention release.

## COUNT FOUR

## UNLAWFUL ARREST AND DETENTION

### (42 U.S.C. § 1983)

108. The foregoing allegations are re-alleged and incorporated herein by reference.

109. This claim is against all non-federal defendants acting under color of law.

110. Defendants' actions violated Mr. al-Kidd's constitutional and legal rights to be free from unlawful arrest and post-release conditions, and punitive and unconstitutional conditions of confinement and detention in violation of 42 U.S.C. § 1983 and the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

## COUNT FIVE

## UNLAWFUL MAINTENANCE OF RECORDS

### (Expungement Action at Common Law)

111. The foregoing allegations are re-alleged and incorporated herein by reference.

112. Upon information and belief, Defendants FBI and TSC have entered and presently maintain records related to Mr. al-Kidd's arrest and detention in the NCIC and TSC databases, respectively.

113. Upon information and belief, defendants have entered and presently maintain records related to Mr. al-Kidd's arrest and detention in other databases and record systems.

114. The government may not retain records of arrests or detentions where the maintenance of such records would be fundamentally unfair, such as where the arrest or detention was illegal.

115. Mr. al-Kidd's arrest and detention violated the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and 28 U.S.C. § 3144.

COMPLAINT - 22

116. Maintenance of records of his arrest and detention would be fundamentally unfair and unlawful.

## COUNT SIX

## UNLAWFUL MAINTENANCE OF RECORDS

## (Expungement Action Under NCIC Statute, 28 U.S.C. § 534)

117. The foregoing allegations are re-alleged and incorporated herein by reference.

118. Upon information and belief, Defendant FBI has entered and presently maintains records of Mr. al-Kidd's arrest and detention in the NCIC database.

119. Congress has authorized Defendant FBI to enter specified records into the NCIC database and disseminate them to prospective employers, law enforcement officials, and other public and private agencies.

120. Congress has not authorized the FBI to enter records of the arrest and detention of persons subject to material witness warrants into the NCIC database.

121. Defendant FBI's entry into the NCIC of records relating to the arrest and detention of Mr. al-Kidd pursuant to a material witness warrant is arbitrary, capricious, and not authorized by the NCIC statute, 28 U.S.C. § 534.

122. Mr. al-Kidd is entitled to declaratory and injunctive relief ordering that records related to his unlawful arrest and detention be expunged from the NCIC.

## RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

123. A declaration that Defendants' actions violated the Constitution, 42 U.S.C. § 1983, and the material witness law, 28 U.S.C. § 3144, and the common law.

124. A declaration that Defendants' actions, practices, customs, and policies, regarding the arrest and detention and release conditions of material witnesses, alleged herein were unjustified, illegal and violated the constitutional and legal rights of Abdullah al-Kidd.

125. A declaration that Defendants improperly used the material witness statute to improperly constrain the liberty of Abdullah al-Kidd.

126. Expungement of all records, fingerprints and notations relating to the unlawful arrest and detention of Mr. al-Kidd as a material witness.

127. Expungement of all FBI records or files in the NCIC, TSC and any other databases, that are unconstitutional, unlawful, or inaccurate.

128. Trial by jury.

129. Compensatory damages in an amount to be proven at trial.

130. Punitive damages in an amount to be proven at trial.

131. Costs and reasonable attorney fees.

132. Such other relief as the Court deems just and equitable.


DATED: March 15, 2005.

Respectfully submitted,


THE ROARK LAW FIRM, LLP
HAMPTON & ELLIOTT
WOOLLEY & POGUE, PLLC

R. KEITH ROARK
Attorneys for Plaintiff


COMPLAINT - 24

THOMAS E. MOSS
UNITED STATES ATTORNEY
DISTRICT OF IDAHO
**KIM R. LINDQUIST**
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WELLS FARGO CENTER, SUITE 201
877 WEST MAIN STREET
BOISE, IDAHO   83702
TELEPHONE:   (208) 334-1211
**MAILING ADDRESS:   P.O. BOX 32
   BOISE, IDAHO 83707**

UNITED STATES COURTS
DISTRICT OF IDAHO

MAR 1 7 2003

_____M.REC'D_____
LODGED____FILED_____

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

UNITED STATES OF AMERICA          )
                                  )     CR No. 03-048-C-EJL
          vs.                     )
                                  )     APPLICATION FOR ARREST
SAMI OMAR AL-HUSSAYEN,            )     WARRANT OF MATERIAL WITNESS
                                  )
          Defendant.              )
_____)

The United States of America and Thomas E. Moss, United States Attorney for the District of Idaho, by and through Kim R. Lindquist, Assistant United States Attorney, with this Application for Arrest Warrant of Material Witness, and move the Court that an arrest warrant be issued for the following material witness: Abdullah Al-Kidd, a/k/a Lavoni T. Kidd.

On February 13, 2003, an Indictment was filed in United States District Court for the District of Idaho alleging violations of 18

*APPLICATION FOR ARREST WARRANT OF MATERIAL WITNESS - 1*

34

EXHIBIT A ■

U.S.C. §§ 1001(a)(1) and (2), and 3238 – False Statement to the United States; and 18 U.S.C. §§ 1546(a), 3237 and 3238 – Visa Fraud.  As a result of said Indictment, a warrant of arrest for the defendant was issued.

The testimony of the aforementioned material witness is material to both the prosecution and the defendant herein.

There is a risk that unless the Court detains or imposes restrictions on the travel of said material witness, he will be unavailable at future proceedings in this case.

This application is further based upon the Affidavit of Scott Mace, Special Agent, Federal Bureau of Investigation, the Indictment filed herein, and the warrant of arrest against the defendant herein.

DATED this _14th_ day of March, 2002.

THOMAS E. MOSS
United States Attorney
By

Kim R. Lindquist
Assistant United States Attorney

*APPLICATION FOR ARREST WARRANT OF MATERIAL WITNESS - 2*

STATE AND DISTRICT OF IDAHO

BOISE, IDAHO

UNITED STATES OF AMERICA )
                                   )
v.                               )        Case No. 03-048-C-EJL
                                   )
SAMI OMAR AL-HUSSAYEN  )
                                   )
                                   )
                                   )

### AFFIDAVIT

I, SCOTT MACE, the undersigned, being duly sworn, depose and state as follows:

I am a Special Agent of the FBI currently assigned to the Boise, Idaho, Resident Agency of the Salt Lake City Division. I have been a Special Agent of the FBI for six years and have been involved in multiple investigations involving crimes under Title 18 of the United States Code. This Affidavit is based upon facts acquired by fellow FBI Special Agent Michael James Gneckow and other law enforcement officials pertaining to the investigation. On March 14, 2003, Special Agent Michael James Gneckow advised your affiant of the following:

1) Gneckow is a Special Agent with the Federal Bureau of Investigation (FBI), currently assigned to the Coeur d'Alene, Idaho Resident Agency, within the FBI's Salt Lake City Division. He has been a Special Agent with the FBI for six (6) years and has ten (10) additional years of Federal law enforcement experience as a Special Agent with the U.S. Naval Criminal Investigative Service (NCIS). He has a Masters Degree in National Security Affairs and has spent the majority of his career investigating matters relating to the national security of the United States.

2) Based upon his own observation and those of other law enforcement officers involved in the subject investigation, this affidavit is made in support of an application for arrest warrant of a material witness, namely: Abdullah Al-Kidd, a/k/a Lavoni T. Kidd.

1

3) During the past 16 years Gneckow has been involved in dozens of investigations involving illegal activities such as terrorism and money laundering, including the Olympic Park Bombing in Atlanta and numerous investigations overseas. During the period of 1986 to 1996, he was assigned as a foreign counterintelligence/international terrorism investigator with the United States Naval Criminal Investigative Service. For the past six years, as a Special Agent with the FBI, he has been assigned numerous terrorism investigations and has been involved in several search warrants, many of which were related to terrorism or terrorism-related matters. During his career with NCIS and the FBI, he has worked closely with agents and officers of many other agencies, including the CIA, DEA, ATF, Customs Service, IRS, FBI, INS and the various investigative/intelligence components of the United States Armed Forces, concerning matters relating to the national security of the United States.

4) In addition to his personal experience as above-referenced, he has received specialized training in the area of terrorism and counter-terrorism, as well as economic-based crime, by attending numerous seminars offered by the Department of Justice, FBI, and other agencies. He has also participated as an instructor in some of these seminars.

5) Gneckow is currently a member of the Inland Northwest Joint Terrorism Task Force and as such, works alongside other Federal, state and local law enforcement officers, including agents of the U.S. Immigration and Naturalization Service (INS) and other personnel who investigative document fraud by foreign nationals.

6) On February 13, 2003, an Indictment was filed in United States District Court for the District of Idaho alleging violations of 18 U.S.C. §§ 1001(a)(1) and (2), and 3238 - False Statement to the United States; and 18 U.S.C. §§ 1546(a), 3237 and 3238 - Visa Fraud. During the course of that investigation, information was developed regarding the involvement of Abdullah Al-Kidd with the defendant. That information includes that from March 2000 to November 2001, an individual identified as Abdullah Al-Kidd, a/k/a Lavoni T. Kidd, and/or his spouse, Nadine Zegura, received payments from Sami Omar Al-Hussayen and his associates in excess of $20,000.00. Al-Kidd traveled to Sana'a, Yemen, in August 2001 and remained there until April 2002, when he returned to the United States. Upon his return to the

2

United States, Al-Kidd traveled to Moscow, Idaho, and met with Al-Hussayen's associates. While in Moscow, Al-Kidd emptied a storage facility which contained personal items belonging to him. Among those personal items were documents Al-Kidd left behind, which included a conference program for the second annual IANA conference in Dearborn, Michigan, in December 1994; a hotel receipt from Sacramento, California, dated 4/26/2001, in the name of Abdullah Al-Kidd, listing his company name as "Al-Multaqa;" and telephone numbers for IANA (734-528-0006) and Basem Khafagi (734-481-1930). Khafagi is a former Director of IANA and former University of Idaho student (graduated in 1988) who was recently arrested in New York.

7) Kidd is scheduled to take a one-way, first class flight (costing approximately $5,000.00) to Saudi Arabia on Sunday, March 16, 2003, at approximately 6:00 EST. He is scheduled to fly from Dulles International Airport to JFK International Airport in New York and then to Saudi Arabia.

8) Due to Al-Kidd's demonstrated involvement with the defendant, Sami Omar Al-Hussayen, he is believed to be in possession of information germane to this matter which will be crucial to the prosecution. It is believed that if Al-Kidd travels to Saudi Arabia, the United States Government will be unable to secure his presence at trial via subpoena.

Respectfully submitted,

_____
SCOTT MACE
Special Agent
Federal Bureau of Investigation
Boise, Idaho

Subscribed and sworn to before me this __14__ day of March, 2003.

_____
Mikel H. Williams
United States Magistrate Judge

3