UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


| | | |
|---|---|---|
| ABDULLAH AL-KIDD, | ) | Case No. CV 05-093-EJL-MHW |
| | ) | |
| Plaintiff, | ) | REPORT AND RECOMMENDATION |
| | ) | RE: MOTIONS FOR SUMMARY |
| | ) | JUDGMENT |
| v. | ) | |
| | ) | |
| | ) | |
| ALBERTO GONZALES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Abdullah al-Kidd alleges the conditions of his confinement at the Ada County

Jail were excessive, arbitrary and punitive in violation of the due process clause of the

Fourteenth Amendment and seeks to hold former Ada County Sheriff Vaughn Killeen liable in

his individual capacity for any such violations.[1]  Defendant Vaughn Killeen and Plaintiff

Abdullah al-Kidd (hereafter "Killeen" and "al-Kidd") have both filed motions for summary

judgment (Docket Nos. 146 and 149, respectively) on the issue of Killeen's qualified immunity

and liability.  The Court held a hearing on January 17, 2008.  After careful consideration of the

---

[1] Although al-Kidd asserts claims against Killeen for violations of the Fourth and Fifth Amendments and the Material Witness and Bail Reform Statutes, 18 U.S.C. §§ 3142 and 3144, al-Kidd unequivocally stated at the hearing and in his briefing he is not pursuing these claims against Killeen.  Pl.'s Mem. at 1 n.1, Docket No. 149-2; Pl.'s Response at 1 n.1, Docket No. 115.  The Court therefore considers the allegations against Killeen made in Counts One, Two and Three of the First Amended Complaint (Docket No. 40) to be waived by Plaintiff, and will recommend their dismissal.  The remaining claim against Killeen is asserted under the due process clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 for the unlawful conditions of al-Kidd's confinement.  First Am. Compl., Count Four, Docket No. 40.  Killeen is clearly being sued in his individual rather than his official capacity, and is the only individual named in the complaint besides the Federal Defendants.  First Am. Compl. at 11, Docket No. 40.

REPORT AND RECOMMENDATION - 1

parties' submissions and arguments, for the reasons discussed below, the Court recommends that Killeen's motion be granted and al-Kidd's motion be denied. Al-Kidd has not established as a matter of law that Killeen may be held individually liable in his supervisory capacity for enacting unconstitutional policies or procedures that caused al-Kidd's injuries.

**REPORT**

**I.**
**General Background**

As part of an anti-terrorism investigation, al-Kidd was detained as a material witness in a criminal case against Sami Omar Al-Hussayen. FBI Agent Gneckow and other law enforcement agents investigated the information for the material witness warrant, while FBI Agent Mace executed the affidavit in support of the warrant. Based upon the affidavit, the Court approved the warrant application and a material witness arrest warrant was issued for al-Kidd on March 14, 2003. Agents arrested al-Kidd on March 16, 2003, and he was placed in custody in Virginia. After a brief transfer through the Federal Detention Center in Oklahoma, he was booked at the Ada County Jail in Boise, Idaho on March 25, 2003. He was released from custody six days later, on March 31, 2003. His release was conditioned upon surrender of his passport, restriction of travel and mandatory reporting to a probation officer. Ultimately, the government never called al-Kidd to testify in the Al-Hussayen trial and his release conditions were removed on June 16, 2004. Al-Kidd was not charged with a crime at any time before, during, or after his detention as a material witness.

**II.**
**Facts**

The following material facts regarding al-Kidd's confinement in the Ada County Jail are

not in dispute.

**A.     Jail Policies.**

The Jail had several policy and procedure manuals applicable to jail placement and

custody conditions at the time of al-Kidd's detention.  The 1990 Idaho Jail Minimum Standards

for Detention Facilities adopted by the Idaho Sheriff's Association required all facilities to have

written policies and procedures to govern inmate housing and classification.  Aff. of Gelernt, Ex.

31 at 45, Docket No. 149-9.  All inmates were to be subject to the objective classification

process.  The Ada County Jail had established such policies, and the decisions made pursuant to

those policies are at issue here.

Upon booking an inmate, the jail had a policy for initially classifying inmates to a

custody level and assigning a housing unit.  Jail policy defined "Initial Classification" as the

"initial custody assessment/screening process at intake/booking to determine immediate

temporary cell assignment, level of supervision and emergency medical or mental health needs."

Aff. of Gelernt, Ex. 13, Docket No. 149-7.  As set forth in the 1991 Sheriff's Office Policy and

Procedure Manual, the shift supervisor was responsible for determining the appropriate

temporary housing assignment and appropriate supervision level for each new inmate based

upon a recommendation from the booking officer.  Aff. of Gelernt, Ex. 26, at 120, Docket No.

149-8.  Housing determinations required consideration of any special needs of the inmate to

avoid situations where the inmate may harm himself or others.  Aff. of Gelernt, Ex. 26, at 121,

Docket No. 149-8; Ex. 27 at 71, Docket No. 149-9.  Special needs inmates included protective

custody inmates and witnesses, and policy therefore required them to be housed separately from the general population.  Aff. of Gelernt, Ex. 26, at 121, Docket No. 149-8; Ex. 27 at 71, Docket No. 149-9.  Such pre-classified, special management inmates were to be housed in single cells. Aff. of Gelernt, Ex. 22 at 23, Docket No. 150-2.  When an individual had to be housed by themselves, the closed custody unit, or "CCU," was the preferred housing unit.  Aff. of Reading, Ex. 12, Savage Depo. at 59, Docket No. 147-17.

After an inmate was given a housing assignment, an initial custody and supervision level was determined.  The policy established three designated security classification levels.  Within each security classification, there were specific sub levels: minimum security (custody levels 6, 7, and 8); medium security (custody levels 3, 4 and 5); and maximum security (custody levels 1 and 2).  Aff. of Gelernt, Ex. 13 at 2–7, Docket No. 149-7; Ex. 26 at 121, Docket No. 149-8.  The 2001 Security Services manual explained that, to determine custody levels, a prescribed decision path was followed that combined criminal history, current charges, and institutional behavior to arrive at an appropriate custody level.  Aff. of Gelernt, Ex. 27 at 71, Docket No. 149-9.  Custody levels also corresponded to the relative risk the inmate posed to himself or others.  Aff. of Reading, Ex. 4, Shepherd Depo. at 33–36, Docket No. 147-7.

The inmate would next be given a colored jumpsuit to visually indicate the inmate's custody level to jail staff.  Level 1 and 2 inmates were assigned a yellow jumpsuit, Aff. of Reading, Ex. 4, Shepherd Depo. at 44, Docket No. 147-7, while level 4 inmates would be given a different colored jumpsuit.  *See* Aff. of Gelernt, Ex. 22 at 1, Docket No. 150-2 (describing the various color coded jumpsuits).  A custody classification level, however, was independent of the individual's housing unit or protective custody status.  Aff. of Gelernt, Ex. 12, Shepherd Depo.

at 36; Ex. 19, Savage Depo. at 80; Ex. 23, Folwell Depo. at 54, Docket Nos. 149-7, 149-8.

Because security classification was a separate decision from housing placement, a protective

custody inmate could be housed in a private cell within the CCU, but be assigned a minimum

security level 8 custody level.  Aff. of Gelernt, Ex. 12, Shepherd Depo. at 92, Docket No. 149-7;

Aff. of Reading, Ex. 8,  Kinch Depo. at 72, Docket No. 147-11.  *See also* Aff. of Gelernt, Ex. 26,

1999 Policy and Procedure Manual at 43, Docket No. 149-8.[2]

Within 72 hours of booking, an inmate's initial classification would be reviewed during

"primary classification" to assign more appropriate long-term housing.  Aff. of Gelernt, Ex. 26 at

120, Docket No. 149-8; Ex. 27 at 71, Docket No. 149-9.  To perform the primary classification

process, the classification officer was required to use the "Northpointe" decision tree, an

objective tool to assess the individual's past history, behavior, pending charges, and any other

information to arrive at a custody classification level.  Aff. of Gelernt, Exs. 29, 30, and 32,

Docket No. 149-9; Aff. of Reading, Ex. 11, Docket No. 147-16.  The decision tree would result

in a custody level corresponding again to levels 1, maximum security, through 8, minimum

security.

Any custody classification could be subjectively overridden if there was a special

condition present and circumstances warranted an override.  There were two boxes on the

decision tree form that an officer could check to note the category of special condition, one being

"high risk," the other for a general "special condition."  Aff. of Gelernt, Ex. 30, Docket No. 149-

9.  Protective custody status was considered a general "special condition" that required

---

[2] According to policy, an inmate could be assigned an orange jumpsuit for placement in CCU, or if designated as "high risk," a yellow jumpsuit.  These colors, as explained in the manual, provided a visual cue as to an inmate's custody level.

identification on the decision tree form.  Aff. of Reading, Ex. 11, Docket No. 147-16.  An override was appropriate if the classification officer determined that "circumstances require a deviation from the primary decision tree, resulting in a security designation that is other than what would routinely occur."  Aff. of Gelernt, Ex. 30, Docket No. 149-9; Aff. of Reading, Ex. 11, Docket No. 147-16.  However, even if a special condition was noted on the form, the condition "may or may not" require an override to the decision tree.  Aff. of Gelernt, Ex. 30, Docket No. 149-9; Aff. of Reading, Ex. 11, Docket No. 147-16.  Thus, an override was not required simply because a special condition was present.

### B.  Al-Kidd's Confinement.

The United States Marshal for the District of Idaho ("Marshal") contracts with the Ada County Sheriff's Department to house federal prisoners and detainees while awaiting court proceedings.  Aff. of Gelernt, Ex. 4, Docket No. 149-4.  The Agreement contemplates that Ada County will house persons held as material witnesses at the Ada County Jail and specifies that all federal inmates must be held at a level "appropriate for prisoners considered a risk of flight, a danger to the community, or wanted by other jurisdictions."  Aff. of Gelernt, Ex. 4, Docket No. 149-4.  Jail policy therefore required inmates brought in by the Marshal to be assigned a custody level no lower than level 4, medium security.  Aff. of Gelernt, Ex. 13 at 8, Docket No. 149-7.

Pursuant to the housing contract, on March 25, 2003, the Marshal brought al-Kidd to the Ada County Jail to be booked and housed pending a hearing.  Aff. of Savage, Ex. 1, Docket No. 104-6; Aff. of Gelernt, Ex. 10, Docket No. 149-6.  The Marshal's instructions stated that al-Kidd was to be kept "[separate] from all other prisoners for personal protection."  Aff. of Savage, Ex. 1, Docket No. 104-6; Aff. of Gelernt, Ex. 10, Docket No. 149-6.  The booking form indicated

REPORT AND RECOMMENDATION - 6

that the Marshal had placed al-Kidd on a "hold" as a material witness.  Aff. of Gelernt, Ex. 8,

Docket No. 149-6.  A second booking form instructed that al-Kidd was a "material witness in

Al-Hassein/Al Quada [sic] Case."  Aff. of Gelernt, Ex. 16, Docket No. 149-7.

Ada County Deputy Derek Savage ("Savage")  was on intake duty that day and processed

al-Kidd into the facility.  Aff. of Gelernt, Ex. 10, Docket No. 149-6; Aff. of Gelernt, Ex. 49,

Docket No. 149-14.  Savage performed the initial jail classification and assigned al-Kidd to a

cell.  Aff. of Gelernt, Ex. 15, Docket No. 149-7.  Because the Marshal directed that al-Kidd be

separated from other prisoners for his protection, Savage assigned al-Kidd to Cell 1W, known as

the W-Tank, which is a large two man private cell with a private bathroom and telephone.  Aff.

of Gelernt, Ex. 49, Docket No. 149-14.  The W-Tank is located in the Ada County Jail closed

custody unit, or CCU.  Aff. of Reading, Ex. 12, Savage Depo. at 59, Docket No. 147-17.[3]

Al-Kidd was also classified for purposes of assigning an initial custody level.  Aff. of

Reading, Ex. 4, Shepherd Depo. at 21–22, Docket No. 147-7.  Al-Kidd was assigned custody

level 2, and therefore given a yellow jumpsuit at his initial classification.  Aff. of Reading, Ex. 7;

Ex. 12, Savage Depo. at 98–99, Docket Nos. 147-10, 147-17; Aff. of al-Kidd ¶ 10-11, Ex. 1,

Docket No. 149-4; Aff. of Gelernt, Ex. 18, Docket No. 149-7.  Normally, according to the

agreement between the Marshal and Ada County, al-Kidd would have qualified for assignment at

a custody level 4 when he was processed.  However, some person who has not been identified

overrode that determination and placed him at a level 2, maximum security, at the initial

classification.  Aff. of Gelernt, Ex. 19, Savage Depo. at 101, Docket No. 149-7.  Savage testified

that the pre-classification custody assignment would be noted on an erasable white board, subject

---

[3] A complete record of al-Kidd's jail file is attached to the Aff. of Shepherd, Attach. 1, and Ex. 1, Attach. 2, Docket No. 105, submitted in support of Killeen's first Motion for Summary Judgment, Docket No. 104.

to later review.  Aff. of Gelernt, Ex. 19, Savage Depo. at 101, Docket No. 149-7.

The 2001 Sheriff's Procedure Manual indicates level 2 or maximum security custody denotes "[h]igh-risk inmates . . . who have a record of past or present crimes where behavior suggests a threat to officer safety or escape.  The decision to place an inmate in yellow coveralls shall be approved by the shift supervisor."  Aff. of Gelernt, Ex. 22 at 1, Docket No. 150-2.  The yellow jumpsuit provides a visual signal so that guards can handle the inmate appropriately.  Aff. of Reading, Ex. 6, Laky Depo. at 105, Docket No. 147-9.  The decision to classify al-Kidd at custody level 2 dictated the mandatory use of handcuffs, belly chains, and leg irons "to prevent escape and to ensure the security and order of the facility," and the restraints were required when transporting al-Kidd anywhere outside of his cell.  Aff. of Gelernt, Ex. 22 at 13, 19, Docket No. 150-2.  There is no dispute, however, that al-Kidd did not have a history of criminal behavior, and he had been cooperative with all persons he had come in contact with during his journey to Idaho.

Once classified at a level 2 custody level, there was no policy exception that would allow an inmate to leave his cell without shackles, even if the inmate was in protective custody.  Aff. of Reading, Ex. 8, Kinch Depo. at 96, 106, 122, Docket No. 147-1.  Classification at custody level 2 also required al-Kidd to be escorted by two officers when out of his cell and locked down in an individual cell except for "tier time," which was limited to one hour and thirty minutes each day.  Aff. of Gelernt, Ex. 22 at 19, 23, Docket No. 150-2; Aff. of Reading, Ex. 8, Kinch Depo. at 123-24, Docket No. 147-1.  Tier time was spent in individual bull pens in the CCU outdoor recreation area while remaining in leg irons and belly chains during that time.  Aff. of Gelernt, Ex. 27 at 82-83, Docket No. 149-9.

Four days later, on March 29, 2003, Deputy Timothy Kinch ("Kinch"), a classification officer, performed the primary classification process for al-Kidd.  Aff. of Gelernt, Ex. 32, Docket No. 149-9.  According to the Northpointe system, al-Kidd was assigned a level 4 custody level, which Kinch overrode to custody level 2.  Aff. of Gelernt, Ex. 32, Docket No. 149-9; Aff. of Reading, Ex. 8, Kinch Depo. at 51-52, Docket No. 147-11.  Jail documents indicate the reason for the override was al-Kidd's status as a "high profile witness."  Aff. of Gelernt, Exs. 33, 35, 40 at Bates No. 2036, 42 at Bates No. 2288, Docket Nos. 149-10, 149-11, 149-12, 149-13.  Accordingly, al-Kidd remained in the W-Tank in the CCU unit at custody level 2 until his release from Ada County Jail three days later on March 31, 2003.

Kinch explained that an override required the use of his subjective judgment, and could be done if he felt a special circumstance or condition required a change from the objective classification.  Aff. of Reading, Ex. 8, Kinch Depo. at 28, 99, Docket No. 147-11.  Protective custody inmates could be subjectively classified at a higher custody level if a medium security classification would not provide enough safety and security for the inmate or jail staff.  Aff. of Reading, Ex. 8, Kinch Depo. at 99–104, Docket No. 147-11.  However, it was unusual to place protective custody inmates in yellow uniforms.  Aff. of Reading, Ex. 8, Kinch Depo. at 123–24, Docket No. 147-11.  There was no guideline for making a determination to place a protective custody inmate in yellow, and the only reason for doing so would be to add a degree of safety by providing a visual cue to jail staff that the inmate required special treatment for safety reasons.  Aff. of Reading, Ex. 8, Kinch Depo. at 122–25, Docket No. 147-11.

Yet Kinch also noted that it was possible to classify an inmate in protective custody at a lower custody level and place special instructions in his file.  Aff. of Reading, Ex. 8, Kinch

REPORT AND RECOMMENDATION - 9

Depo. at 118–119, 121, Docket No. 147-11.  Policy required all personnel to inform themselves of special instructions concerning a specific inmate.  Aff. of Gelernt, Ex. 26 at 123, Docket No. 149-8.  Despite the ability to write special instructions, Kinch's rationale for continuing to classify al-Kidd at custody level 2 was to provide him with an additional layer of safety, so that there was no margin for error by jail staff if they did not read special instructions placed in his file.  Aff. of Reading, Ex. 8, Kinch Depo. at 101–103,121–125, 226–28; Ex. 9, Docket Nos. 147-11, 147-12.  The yellow jumpsuit would provide the visual cue to jail personnel instead.  Neither Kinch's decision to continue to place al-Kidd in yellow, nor the initial classification, were reviewed by a supervisor.  Aff. of Reading, Ex. 9, Kinch Depo. at 227–28, Docket No. 147-12.

Al-Kidd confirmed that at booking, he was assigned a yellow jumpsuit and placed in a cell by himself.  Aff. of al-Kidd, Ex. 1, Docket No. 149-4.  He described the cell as having a security camera and large windows that faced the inside of the jail such that he had no privacy.  In addition, he confirmed that he was escorted outside of his cell by two guards while in shackles, even when taken to the exercise pen.  Al-Kidd also claims he experienced ants in his cell, lighting that remained on at night making it difficult to sleep, and cold temperatures in his cell.[4]  *See* Aff. of Reading, Ex. 3, al-Kidd Depo. at 48-49, 64-67, 73-77, 95, 97, 100, 104, 109, Docket No. 147-3, 4, 5, 6.[5]

---

[4]  Killeen presented evidence that the lighting was dimmed at night in the CCU, that the temperature readings were constant in the CCU, and of regular pest control measures.  Aff. of Stiewig, Docket No. 146-3; Aff. of Stiewig, Ex. 1, Docket No. 153 (CCU temperature data); Aff. of Stiewig, Exs. 1 and 3, Docket No. 104-9, 104-10, 104-12, (extermination schedule and lighting requirements).  However, this evidence merely points to general circumstances that existed at the time within the CCU and jail as a whole.  The evidence does not refute al-Kidd's assertions that the lights and temperature in his cell within the CCU may have been different than the general CCU ward, nor does it refute al-Kidd's assertion that ants existed in his cell during his confinement.

[5]  These page references contain a complete description of al-Kidd's subjective experience during his confinement, which is summarized here.

REPORT AND RECOMMENDATION - 10

### C. Killeen's Knowledge.

In 2003, Killeen was the elected Sheriff of Ada County, a position that he had held for the previous eighteen years.  Aff. of Reading, Ex. 17, Killeen Depo. at 11, Docket No. 147-25. As Sheriff, he was responsible for maintaining and operating the jail, overseeing the policies and procedures used in the jail, and for the classification policies.  Aff. of Reading Ex. 17, Killeen Depo. at 12, 51–52, Docket No. 147-25.  He did not actually establish policies used in the jail, but was ultimately responsible for policy review and ensuring that appropriate policies were in place.  Aff. of Reading, Ex. 17, Killeen Depo. at 11–15, Docket No. 147-25.

Although the jail occasionally might hold a material witness, it was a rare event.  Aff. of Reading, Ex. 17, Killeen Depo. at 18–20, Docket No. 147-25.  Killeen confirmed that there were no specific policies applicable to persons detained as material witnesses and not charged with a crime other than a policy to house them separately from other inmates, generally in the CCU. Aff. of Reading Ex. 17, Killeen Depo. at 22–24, 28–29, 35, 39, 91, Docket No. 147-25.  Killeen also discussed the applicable policies consistent with the descriptions given by jail personnel Kinch, Shepherd, and Savage, and confirmed that an override of the classification level applicable to U.S. Marshal holds would be a discretionary decision.  Aff. of Reading, Ex. 17, Killeen Depo. at 51–56, 158–63, Docket No. 147-25.  Material witnesses not charged with a crime would be subject to the same classification policies as other inmates because of the safety concerns in the jail environment.  Aff. of Reading, Ex. 17, Killeen Depo. at 74, 84–85, 99–100, Docket No. 147-25.

Killeen was aware only in passing that al-Kidd was housed at the jail.  Aff. of Reading, Ex. 17, Killeen Depo. at 107–109, Docket No. 147-25.  At the time, Killeen had no knowledge

of the conditions of al-Kidd's confinement or his classification level.  Aff. of Reading, Ex. 17,

Killeen Depo. at 128–136, Docket No. 147-25.  Killeen was not involved in making any

decisions applicable to al-Kidd during the period of his confinement.  *Id.*

### III.
### Summary Judgment Standard

Motions for summary judgment are governed by Fed. R. Civ. P. 56, which provides in

pertinent part that judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2007).

A moving party who does not bear the burden of proof at trial may show that no genuine

issue of material fact remains by demonstrating that "there is an absence of evidence to support

the non-moving party's case."  *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986).  Once the

moving party meets the requirement of Rule 56 by either showing that no genuine issue of

material fact remains or that there is an absence of evidence to support the non-moving party's

case, the burden shifts to the party resisting the motion who "must set forth specific facts

showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations or denials of

his pleadings."  *Anderson*, 477 U.S. at 256.  Genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party."  *Id.* at 250.  "When determining if a genuine factual issue . . . exists, . . . a trial judge must

bear in mind the actual quantum and quality of proof necessary to support liability."  *Id.* at 254.

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.  *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992).  The Ninth Circuit has found that in order to resist a motion for summary judgment,

> the non-moving party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 ((9th Cir. Cir. 1989).  When both parties file simultaneous cross-motions for summary judgment, the Court still bears the responsibility for determining whether disputed issues of material fact are present, and must evaluate all of the evidence submitted.  *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 ((9th Cir. Cir. 2001).

## IV.
## Discussion

**A.      The Parties' Arguments.**

Al-Kidd argues that his conditions of confinement were arbitrary, capricious, and

punitive because he was treated as a terrorism suspect and a criminal despite the absence of criminal charges.  Specifically, al-Kidd contends that his classification at custody level 2 was improper, because by applying that standard, he was subjected to full restraints when removed from his cell.  He also contends that his housing assignment was punitive because the W-Tank had no privacy due to the windows and surveillance camera.  Al-Kidd contends that other alternatives were available that were less invasive into his privacy, such as the medical unit.  Lastly, he alleges that the lack of  cleanliness from the ants and food, the cold temperature, and the constant lighting at night combined to make his confinement extremely uncomfortable.

Since al-Kidd was not charged with a crime, al-Kidd asserts that the appropriate standard to evaluate the conditions of his confinement is not the "deliberate indifference" standard, but the more lenient standard applicable to non-criminal detainees articulated in *Youngberg v. Romeo*, 457 U.S. 307 (1982).  *See also Jones v. Blanas*, 393 F.3d 918 ((9th Cir. Cir. 2004).  Al-Kidd contends that the use of shackles is always punitive unless the government can demonstrate a legitimate penological interest, citing *Murphy v. Walker*, 51 F.3d 714, 718 (7th Cir. 1995) (noting that a pretrial detainee who alleged he was shackled to the floor would be entitled to recover for the infringement of his liberty interest in freedom from bodily restraint unless the government demonstrated a legitimate penological interest for the use of shackles).

Commenting on the applicable policies, al-Kidd asserts that Killeen is liable as a supervisor because he was responsible for jail policies.  He claims that Killeen can be held responsible regardless of whether Killeen personally participated in the confinement decisions or not.  Al-Kidd makes two arguments.  First, he contends that the lack of a policy or specific guidance tailored to material witnesses not charged with a crime caused al-Kidd's injuries.

Alternatively, he argues that the subjective override from the jail's classification system placing al-Kidd at level four indicates staff did not follow policy concerning inmates classified at medium security.

Killeen contends that al-Kidd has not established, as a matter of law, any causal connection between Killeen's conduct and the alleged constitutional violations, and that broad assertions of Killeen's "general" supervisory authority are insufficient to hold him individually liable for the actions of his staff.  Killeen argues that absent personal involvement, he cannot be held responsible for the subjective decisions of his employees if they failed to follow policy or interpreted policy in an unconstitutional manner.  With respect to jail policies, Killeen contends that the jail's policies, or lack thereof with respect to material witnesses, are not in and of themselves so deficient that the policy or lack of policy is a repudiation of constitutional rights.

Concerning the conditions of al-Kidd's confinement, Killeen asserts that the "deliberate indifference" standard is applicable under *Bell v. Wolfish*, 441 U.S. 520 (1979) rather than the more lenient standard under *Youngberg*.  Killeen argues that a detainee's rights are not violated if restrictions are imposed for a legitimate governmental purpose, such as safety, and not imposed for the purpose of punishment.  Thus, Killeen contends the decision to classify al-Kidd at level 2 for his personal safety was justified, even if it resulted in shackling, which was incidental to the custody classification.  In the end, Killeen defends his jail policies, claiming that Kinch's subjective decision as well as the officer's decision at booking were the cause of his alleged injuries.  He also asserts the defense of qualified immunity from suit, arguing that there is no standard applicable to material witnesses dictating the conditions of confinement.

**B.**      **Applicable Standards.**

**1.**      **Qualified Immunity Standard.**

The Supreme Court has instructed that rulings on the qualified immunity defense "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive," inasmuch as the defense is "an immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

In Section 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Contrarily, a state official may be held personally liable in a Section 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights. *Harlow*, 457 U.S. at 818. True to its dual purpose of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The threshold question in considering application of the qualified immunity defense is whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). If, viewing the alleged injuries in a light most favorable to the plaintiff, the Court finds that a constitutional right appears to have been violated, it proceeds to the next step, which is to inquire whether the right was clearly

established.  *Id*.

The qualified immunity analysis therefore requires two inquiries.  First, the Court determines whether the law was clearly established "in light of the specific context of the case." *Saucier*, 533 U.S. at 201.  If there is no clearly established law, then the officer is entitled to qualified immunity.  If the law is clearly established, the Court determines whether, in light of that law, it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202 (citation omitted).

To determine whether the right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act.  *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996) (citation omitted).  In the absence of binding precedent, the district courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established.  *Osolinski*, 92 F.3d at 936. (citation omitted).

The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. at 201.  For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  It is not necessary that the "very action in question has previously been held unlawful, . . . but it is to say that in the light of preexisting law the unlawfulness must be apparent" to the official.  *Anderson*, 483 U.S. at 640.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 194-95 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

Application of qualified immunity is appropriate where "the law did not put the [defendant] on notice that his conduct would be clearly unlawful." *Saucier*, 533U.S. at 195. However, if there is a genuine dispute as to the "facts and circumstances within an officer's knowledge," or "what the officer and claimant did or failed to do," summary judgment is inappropriate. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). When a Section 1983 defendant makes a properly supported motion for summary judgment based on immunity, the plaintiff has the obligation to produce evidence of his own; the district court cannot simply assume the truth of the challenged factual allegations in the complaint. *Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 963 ((9th Cir. Cir. 2004). "[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

**2.      Conditions of Confinement.**

Under the material witness statute, a witness whose presence at trial may not be secured may be arrested and treated in accordance with 18 U.S.C. § 3142. 18 U.S.C. § 3144. An individual may be detained until a detention hearing is held. 18 U.S.C. § 3142(f)(2). While there is no case law specifically applicable to the conditions of confinement for material witnesses not also charged with a crime, at the time of al-Kidd's confinement in March 2003, the law governing confinement conditions for both pretrial detainees and civilly committed individuals was clearly established. Although Killeen attempts to draw the distinction more narrowly by arguing the law was not established with respect to the conditions of confinement for detained material witnesses not charged with a crime, the Court concludes that such an

individual cannot be treated more harshly than a pretrial detainee, and should be afforded at least the protections of a civilly committed individual. *See Jones v. Blanas*, 393 F.3d 918, 932 ((9th Cir. Cir. 2004) (explaining that an individual detained awaiting civil commitment proceedings is entitled to protections at least as great as those afforded to a civilly committed individual and at least as great as those afforded to an individual accused by not convicted of a crime).[6] Neither a pretrial detainee nor a civilly committed individual has been convicted of a crime, and both are detained in an institution awaiting further proceedings, as is a material witness. *See* 18 U.S.C. §§ 3144, 3142(f)(2) (allowing detention pending a hearing).

According to *Bell v. Wolfish*, 441 U.S. 520, 531, 535 (1979), pretrial detainees "retain the rights afforded unincarcerated individuals," and so their conditions of confinement must not amount to punishment. To determine if conditions are punitive, the determination hinges upon "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purposes assigned [to it]." *Bell*, 441 U.S. at 538. Under established Ninth Circuit authority, a condition is punitive under *Bell* if it is "intended to punish," or is "excessive in relation to its non-punitive purpose," or "is employed to achieve objectives that could be accomplished in so many alternative and less harsh conditions." *Jones*, 393 F.3d at 934 (citations omitted). But, if a particular condition or restriction of pretrial detention is "reasonably related to a legitimate governmental objective, it

---

[6] Killeen argues that the principles discussed in *Jones* do not apply in this case because *Jones* was decided in 2004, after al-Kidd's confinement. However, *Jones* drew from two previously established cases, *Youngberg* and *Bell*, in discussing the rights of a civilly detained individual awaiting commitment proceedings. Thus, *Jones* is applicable, because subsequent case law may be applied if binding authority indicates that the right existed, even if no case had so declared. *See Hydrick v. Hunter*, 500 F.3d 978, 989 (9th Cir. Cir. 2007) (explaining that the exact behavior does not have to be declared unconstitutional so long as the right was clearly established at the time the alleged violations first occurred, and binding authority indicated that the right existed).

does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539.  Legitimate, non-punitive government interests include "ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility." *Jones*, 393 F.3d at 932 (citing *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1484 ((9th Cir. Cir. 1993)).

Civilly committed individuals, on the other hand, are entitled to more considerate treatment and conditions of confinement.  *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982).  For such individuals, the state has a duty to provide adequate food, shelter, clothing, and medical care.  *Youngberg*, 457 U.S. at 324.  Individuals also enjoy a constitutionally protected interest in reasonably nonrestrictive confinement conditions, including a prohibition upon restraining residents "except when and to the extent professional judgment deems this necessary to assure . . . safety."  *Youngberg*, 457 U.S. at 324.  Here, too, the conditions of confinement must relate to the purpose of the individual's commitment.  *Youngberg*, 457 U.S. at 324.  However, a "presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held, or where the individual is detained under conditions more restrictive than those he or she would face upon commitment."  *Jones*, 393 F.3d at 934.  Yet, professionals in the institution are accorded deference for their decisions.  *Youngberg*, 457 U.S. at 324.

### 3.     Supervisor Liability.

Because al-Kidd sued Killeen in his supervisory capacity as a policy maker, he must not only show that Killeen's subordinates violated his constitutional rights, but also that Killeen caused those violations.  *Hydrick v. Hunter*, 500 F.3d 978, 988 ((9th Cir. Cir. 2007) (explaining that a supervisor is liable for the constitutional violations of his subordinates if the supervisor participated in the conduct in some fashion, either directly or as a policy maker).  *See also*

*Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding that a supervisor must have caused the deprivation of a federal right to be held liable); *Leer v. Murphy*, 844 F.2d 628, 633-34 ((9th Cir. Cir. 1988) (holding that a plaintiff must show how the actions of each defendant caused the constitutional violation).   Absent a state law imposing liability, *respondeat superior* or vicarious liability upon a supervisor may not be imposed in a Section 1983 action.   *Redman v. County of San Diego*, 942 F.2d 1435, 1446 ((9th Cir. Cir. 1991).   *See also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (holding that there is no *respondeat superior* liability under section 1983). Al-Kidd brought no such state law to the Court's attention.   Therefore, supervisor liability may only be predicated upon the supervisor's "(1) personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."   *Redman*, 942 F.2d at 1446 (citations omitted).   *See also Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003); *Hansen v. Black*, 885 F.2d 642, 646 ((9th Cir. Cir. 1989).

If there is overt participation, causation will be established if the supervisor actually participated in or directed the violations, or knew of the violations and failed to act to prevent them.   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).   *See also Edgerly v. City and County of San Francisco*, 495 F.3d 645, 660 (9th Cir. 2007) (finding liability for a supervisor's own culpable action or inaction, acquiescence in the constitutional deprivations, or for conduct showing a reckless or callous indifference to the rights of others); *Larez v. City of Los Angeles*, 946 F.3d 630, 646 ((9th Cir. Cir. 1991) (requiring a showing that the supervisor set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known would cause others to inflict the constitutional injury); *Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir. 1989) (citing *Johnson v. Duffy*, 588 F.2d

740, 743-44 (9th Cir. 1978)) (requiring affirmative act, concurrent participation in the act of another, or the failure to perform an act legally required).

Supervisors may also be liable for the unconstitutional acts of their subordinates based upon the creation of policies and procedures that cause constitutional violations. *Hydrick v. Hunter*, 500 F.3d 978, 988 ((9th Cir. Cir. 2007) (holding plaintiffs sufficiently alleged that supervisors may be liable for creating policies and procedures that violated plaintiffs' constitutional rights). *See also Larez*, 946 F.2d at 645 (stating that the proof of individual liability versus official capacity liability, which is attributed to policy or custom, often overlaps). Similarly, an act performed pursuant to "a custom," even though not formally approved, may subject a municipality or supervisor to liability on the theory that the practice is "so widespread as to have the force of law." *Board of the County Commissioners of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997). There must be, however, a direct causal link between the deprivation of the constitutional right and the identified policy. *City of Canton*, 489 U.S. at 385.

Policies or customs may be either facially constitutional or unconstitutional, both of which are actionable depending upon the circumstances. A policy may create liability without overt participation by the supervisor in the offensive act if the supervisory official implements a policy "so deficient that the policy 'itself is a repudiation of constitutional rights' and is the 'moving force of the constitutional violation.'" *Redman*, 942 F.2d at 1446; *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). The requisite causal connection may be established if the supervisor set in motion "a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Redman*, 942 F.2d at 1447 (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 ((9th Cir. Cir. 1978)). *C.f., Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 691 (1978) (holding that a governmental entity is not

liable unless the execution of a government's policy or custom caused the injury of which plaintiff complains). In other words, the policy itself must actually foster the alleged violation. *Thomas v. Ashcroft*, 470 F.3d 491, 497 (2nd Cir. 2006).

If the policy on its face is constitutional, however, a more difficult question is presented because acts taken in accordance with such policy may be unconstitutional. *Brown*, 520 U.S. at 406; *City of Canton*, 489 U.S. at 386–87. But, a municipality and its supervisory agents would not automatically be liable under such a policy if an employee happened to apply the policy in an unconstitutional manner, for that would result in *respondeat superior* liability. *City of Canton*, 489 U.S. at 387. *See also Brown*, 520 U.S. at 407 (holding that an employee's act without more, "will not permit an inference of municipal culpability and causation."); *Gillette v. Delmore*, 979 F.2d 1342, 1348 ((9th Cir. Cir. 1992) ("unconstitutional discretionary actions of municipal employees generally are not chargeable"). The policy must still be the "moving force" behind the injury alleged. *Brown*, 520 U.S. at 404.

To find causation, there must be a showing that a valid policy is unconstitutionally applied by an employee as a result of a failure to adequately train the employee, and that the failure to train caused the constitutional deprivation. *City of Canton*, 489 U.S. at 387. Alternatively, a pattern of tortious conduct by inadequately trained employees may show that the lack of proper training, rather than a "one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident," may be the "moving force" behind the plaintiff's injury. *Brown*, 520 U.S. at 407–08. On the other hand, a single act of unconstitutional conduct by a nonpolicymaking employee is insufficient to establish that the act was taken pursuant to policy, and therefore insufficient to hold a policymaker liable. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 n.11 (1986).

REPORT AND RECOMMENDATION - 23

When faced with constitutional policies, the failure to train may only serve as the basis for liability if it amounts to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. The policy makers must have made a "deliberate" or "conscious" choice from among various alternatives, and it must be shown that the training is actually inadequate as well as representative of established policy. *City of Canton*, 489 U.S. 389–90. That policy or decision must reflect deliberate indifference "to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411.[7]

When evaluating policies, "prison officials 'should be accorded wide-ranging deference in the adoption of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Frost v. Agnos*, 152 F.3d 1124, 1130 ((9th Cir. Cir. 1998) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). If a particular policy is reasonably related to a "legitimate penological interest," it will be upheld as constitutional. *Frost*, 152 F.3d at 1130 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

**C.      Killeen's Liability.**

In considering Killeen's liability, the Court stresses that neither Savage, Kinch, or any other officer within the jail who participated in the classification and housing assignment process was sued. Under the facts of this case, Killeen does not have any *respondeat superior* liability based upon the actions of his subordinates. Therefore, Killeen's personal liability is only that of a policy maker. As presented to the Court upon motion for summary judgment, the facts do not

---

[7] *See e.g., Henry v. County of Shasta*, 132 F.3d 512, 517–21 ((9th Cir. Cir. 1997) (finding the County and its Sheriff ignored an unwritten policy condoning officers' flagrant mistreatment of detainees held for minor vehicle infractions); *Redman v. County of San Diego*, 142 F.3d 1435, 1445–49 ((9th Cir. Cir. 1991) (finding accepted policy of allowing overcrowding led to housing decisions that exacerbated the dangers posed by aggressive homosexuals to the general prison population).

establish a claim as a matter of law against Killeen as a policy maker.

First, dispensing with actual direct involvement, there is no dispute that Killeen had no personal involvement in either the initial or primary classification process that resulted in al-Kidd's housing assignment to the W-Tank within the CCU and classification at custody level 2. Killeen knew "in passing" that al-Kidd was housed at the jail, but had no personal knowledge about the conditions of his confinement.  Al-Kidd made no showing that Killeen directed, participated in, or had any knowledge of any presumed misconduct on the part of Kinch, the officer in charge of primary classification, or Savage, the officer who participated in the initial classification at booking.  *See Taylor v. List*, 880 F.2d at 1045 (declining to impose personal liability upon the attorney general for the acts of his subordinates absent personal knowledge or participation in the misconduct).  Thus, even assuming that al-Kidd's conditions of confinement rose to the level of constitutional violations, absent direct involvement by Killeen, he may not be held liable.

The more difficult question concerns the jail's policies.  As Sheriff, Killeen was responsible for overseeing the policies and procedures used in the jail.  Assuming Killeen adopted the policies in place during the time of al-Kidd's confinement, he may be held liable in his individual capacity for those policies if the policies were the cause of al-Kidd's constitutional injuries.  At oral argument, counsel clarified that the officers, specifically Kinch, felt constrained by policy to house al-Kidd in the W-Tank and classify him as a level 2 custody inmate.  Al-Kidd argued that the consequences of his classification, namely the shackling, were excessive in relation to the purpose for al-Kidd's detention.  Al-Kidd conceded at oral argument that had he been classified as a level 4 custody inmate, thereby eliminating the shackling and giving him added recreational time, that would have been "okay."  Al-Kidd therefore asserts that the ability

REPORT AND RECOMMENDATION - 25

of Killeen's subordinates to exercise their discretion in an unconstitutional manner consistent with jail policy gave employees the option of acting in an unconstitutional manner.  He argues that policies should have been in place either to specifically apply to material witnesses, or to prevent unconstitutional actions.

The policies at issue in this case are the housing policies applicable to protected witnesses and the classification policies applicable to all inmates.  Policy dictated that protective custody inmates, including protected witnesses, were to be housed separate from the general population.  Upon identification by the Marshal that al-Kidd was a material witness and needed to be kept separate, Savage assigned him to the W-Tank, a private cell within the CCU, consistent with jail policy.  Unwritten policy determined that the W-Tank was the preferred housing unit for non-criminal detainees and juveniles housed in the jail because it is a large, private, two-man cell with its own toilet and sink room, a cot, a television, and a private telephone.  The only other area to place him would have been the medical unit, but that may have exposed al-Kidd to interactions with other inmates and subjected him to attack.

The stated purpose for the housing policy applicable to special management inmates, including material witnesses, was the safety of the individual.  Placing a non-criminal detainee within the general population for criminal inmates would have exposed the detainee to possible injury from the actions of other inmates.  Thus, the articulated need for the separate housing assignment in this case is the protection of the individual for his own safety, which ultimately contributed to the safety and security of the facility by preventing attacks on inmates or by inmates.

Nothing about the housing policy applicable to special management inmates strikes the Court as unconstitutional, under either *Bell* or the lesser standard in *Youngberg*.  Maintaining a

REPORT AND RECOMMENDATION - 26

safe and secure facility, as well as the personal safety of specific inmates, is a legitimate penological interest.  An official cannot be held liable for instituting a facially constitutional policy.  *City of Canton*, 489 U.S. at 387.  *See also Schmelz v. Monroe County*, 954 F.2d 1540, 1544 (11th Cir. 1992) (concluding no personal liability for the sheriff who instituted a facially constitutional policy).

The Court rejects any suggestion that the housing policy applicable to special management inmates, which included those in protective custody like al-Kidd, presents a danger to other material witnesses or posses an excessive risk of serious harm just because the policy exists.  Al-Kidd claims that his housing placement deprived him of his constitutional rights based upon the lack of privacy in his cell due to the windows and the security camera, and the inability to move outside of his cell because of lock down policies in the CCU.  These discomforts are arguably caused by the decision to house him in W-Tank.  But these deprivations existed elsewhere in the jail as well.  And, unlike a strip search or body cavity search, the intrusion upon al-Kidd's privacy interests was small.

Under *Bell*, prison inmates and pretrial detainees may not expect privacy rights to be equivalent to those outside of prison walls, "a retraction justified by the considerations underlying our penal system."  *Bell v. Wolfish*, 441 U.S. at 546.  *See also U.S. v. Van Poyck*, 77 F.3d 285, 291 ((9th Cir. Cir. 1996) (explaining that prisoners and detainees have no reasonable expectation of privacy from observation in a prison environment).  Nor does *Youngberg* compel a different result.  While the conditions in W-Tank may not have been ideal, he certainly was afforded more considerate treatment than the general jail population.  His cell was larger, private in the sense that he was not required to bunk with other persons, and he had his own television and bathroom.

REPORT AND RECOMMENDATION - 27

As for the other conditions of his cell, such as the ants and the night lighting, the "Constitution does not mandate comfortable prisons," and institutions "cannot be free of discomfort" so long as the conditions are humane. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). *Youngberg* also mandates that adequate food and shelter should be provided, so long as the conditions are reasonably safe. In this jail, a pest control policy was used throughout the prison, and the existence of ants in a cell without evidence of an infestation causing health consequences does not establish the requisite "indifference" to or ignorance of al-Kidd's constitutional rights under either *Bell* or *Youngberg*. Nor does the lighting amount to indifference, for the prison had a legitimate need to ensure safety and security during the night hours. The lighting furthered that goal so that officers could still see at night.

Compared to other inmates, al-Kidd's experience of the above conditions was short-lived. He was expected to be there briefly, in this case six days. He was given a private cell, one of the largest cells within the jail and one with the most personal accouterments. His housing was chosen in recognition of al-Kidd's status and need for safety as compared to other areas of the jail. To have placed him in the general prison population or a cell where he could be exposed to harm from other criminal inmates would have been far worse. As a final note, al-Kidd has not identified, nor could the Court locate, any law requiring material witnesses detained in penal facilities to have "special" quarters set aside just for them.

As to the second policy, the classification system identified security levels applicable to all inmates. At a minimum, al-Kidd would have been at a level 4 custody level per jail policy. Al-Kidd conceded that classification at custody level 4 would have been constitutional. Rather, it was the policy's inclusion of a discretionary override that is at issue. As applied, the classification policy initially followed at booking and by Kinch during primary classification

resulted in an override from custody level 4, at which all federal detainees are classified, to custody level 2, maximum security.  The evidence unequivocally indicated that al-Kidd could have been housed in W-Tank within the CCU and been classified at a level other than custody level 2.  Thus, he could have remained at level 4, medium security, and a note could have been placed in his file to alert guards of his special status and need for protection.  Instead, both at initial classification and at primary classification, al-Kidd was assigned custody level 2, maximum security, and flowing from that decision was the mandatory use of physical restraints while outside of his cell.  The override decision was, according to Kinch, subjective and discretionary.

The classification policy appears to be an objective policy to promote security within the facility.  Similar programs undoubtedly exist in other penal institutions.  *See, e.g., Frost v. Agnos*, 152 F.3d 1124, 1130 ((9th Cir. Cir. 1998) (describing classification system resulting in "close custody" status, similar to the close custody status given to level 2 inmates in the Ada County Jail).  *Frost* held that a similar classification system was constitutional.  *Frost*, 152 F.2d at 1130.  As in *Frost*, nothing in the record suggests that the security classification system in and of itself is not reasonably related to a legitimate penological interest or is unconstitutional.

Al-Kidd instead argues that the discretionary component of the policy is unconstitutional because it allows employees to make unconstitutional decisions.  The Court rejects al-Kidd's argument that discretion incorporated into a constitutional policy, without more, somehow subjects Killeen to liability.  It is axiomatic that a constitutional policy allowing discretion could, perhaps as evidenced by the facts of this case, result in the unconstitutional application of that discretion in rare circumstances.  Discretion gives the person applying the policy options that would encompass both decisions that would be constitutional, *e.g.* classification at custody level

REPORT AND RECOMMENDATION - 29

4, and others arguably unconstitutional, *e.g.* classification at custody level 2. But most policies have a discretionary component because no policy can address all situations that an employee may come in contact with.

The Supreme Court rejected the argument presented by al-Kidd in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). There, the policy at issue was that the jailer must take a person needing medical care to the hospital. The policy did not have an objective evaluation process. Instead, jail personnel had to determine if the person actually needed care, a discretionary decision. The Court held that a supervisor could not be held liable if an employee applied a discretionary policy contained in a constitutional policy, albeit in an unconstitutional manner. To hold otherwise would result in liability based upon *respondeat superior*. *City of Canton*, 489 U.S. at 387.

Rather, *Canton* instructs that to be actionable, the discretionary actions of employees made in accordance with a facially constitutional policy must constitute a pattern of tortious conduct by inadequately trained employees. Al-Kidd has not alleged or demonstrated any lack of training or a pattern of applying maximum security overrides to non-criminal detainees who would otherwise be classified at a lower custody level. Further, there is no evidence that Kinch or Savage were inadequately trained to apply the classification criteria or exercise discretionary overrides.

Instead, the evidence shows that al-Kidd's classification override was an isolated incident, peculiar to the situation at hand, and not the result of a lack of training as to how to apply the override policy. In fact, al-Kidd points out that of the 144 protective custody inmates housed in the Ada County Jail during the two years preceding al-Kidd's confinement, not one was also shackled, meaning that none of the protective custody inmates had been classified at

REPORT AND RECOMMENDATION - 30

custody level 2.  Pl.'s Brief at 6, Docket No. 172.   Perhaps Kinch and Savage overreacted in a still fresh 911 environment when it was noted that al-Kidd was a material witness in a federal criminal action involving alleged connections with al-Queada.  But their conduct in deciding to override al-Kidd's custody level is not before the Court since they have not been sued.  And a single incident of unconstitutional conduct by an employee who is not responsible for policy is insufficient to show that the unconstitutional act was taken pursuant to a policy.  Therefore Killeen may not be held individually liable as a matter of law.[8]

---

[8]  Al-Kidd also argues that there should have been a policy applicable only to material witnesses not charged with any crime.  But the same evidence the Court relied upon above also refutes this argument.  Absent any pattern or problem in the past with material witnesses housed in the facility that had not been charged with a crime, Killeen could not and did not know of the need for any policy.  Nor can the Court understand why a classification policy in addition to the general policy applicable to all inmates would be necessary.  All material witnesses brought in by the Marshall are, pursuant to policy, classified at level 4.  Al-Kidd conceded at oral argument that a level 4 classification would have been "ok."  He also conceded that an override to maximum security might, in some circumstances, be necessary.  For example, a violent witness who had attacked a guard but who had otherwise not been charged with a crime may need to be at level 2.  Thus, the general policy, which contained a discretionary component, was sufficient to address the classification of material witnesses.

REPORT AND RECOMMENDATION - 31

## <u>RECOMMENDATION</u>

Based upon the foregoing, the Court being otherwise fully advised in the premises, the

Court **hereby RECOMMENDS that:**

1)      Plaintiff's Motion for Summary Judgment, (Docket No. 149), be DENIED; and

2)      Defendant's Motion for Summary Judgment, (Docket No. 146), be GRANTED;

3)      All other counts against Defendant Killeen alleged in Plaintiff's Complaint be

DISMISSED; and

4)      Plaintiff's Motion to Compel Discovery from Defendant Killeen, (Docket No.

139), be DENIED as MOOT.

Written objections to this Report and Recommendation must be filed within ten (10) days

pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1, or as a result of failing to do so, that

party may waive the right to raise factual and/or legal objections to the United States Court of

Appeals for the Ninth Circuit.

DATED: February 13, 2008

Honorable Mikel H. Williams
Chief United States Magistrate Judge