UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ABDULLAH AL-KIDD,<br><br>                  Plaintiff,<br><br>v.<br><br>ALBERTO  GONZALES, Attorney General<br>of the United States; *et al.*,<br><br>                 Defendants. | Case No. 1:05-cv-00093-EJL-MHW<br><br>**REPORT AND RECOMMENDATION<br>ON CROSS MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>**INDIVIDUAL DEFENDANTS<br>MICHAEL GNECKOW AND SCOTT<br>MACE** |

## INTRODUCTION

Before the Court are two cross-motions for summary judgment filed by Plaintiff

Abdullah al-Kidd and two Federal Bureau of Investigation agents, Defendants Michael

Gneckow and Scott Mace. (Dkt. Nos. 307, 308, 310.)  The motions are the last chapter of

Plaintiff Abdullah al-Kidd's ("al-Kidd") complaint stemming from his allegations that he

was unlawfully arrested and held as a material witness in the case of *United States v.*

**REPORT AND RECOMMENDATION - 1**

*Sami Omar al-Hussayen,* Case No. 3:03-cr-00048-EJL, then pending in the United States District Court for the District of Idaho.

At the time of his arrest on March 16, 2003, al-Kidd, a United States citizen who converted to Islam while studying at the University of Idaho, was about to board a flight leaving from Dulles Airport in Virginia bound for Saudi Arabia, where he was going to continue his religious studies at Umm al-Qora University. Al-Kidd was arrested on a material witness warrant issued by this Court[1] based upon an affidavit presented by agents of the Federal Bureau of Investigation ("FBI") on the grounds that al-Kidd's testimony was necessary to the prosecution of the *al-Hussayen* case, and he was about to leave the United States on the eve of trial. Individual defendants Michael Gneckow and Scott Mace ("Agent Mace" and "Agent Gneckow") are the agents who sought and presented the application for the material witness warrant.[2]

Defendants Gneckow and Mace assert they are entitled to qualified immunity for their actions in pursuing the warrant, contending that there was probable cause to obtain the warrant pursuant to 18 U.S.C. § 3144. Al-Kidd argues to the contrary, arguing the warrant was facially deficient and, even if amended, could not support a probable cause

---

[1] When the term "the Court" is used in this Report and Recommendation, the term refers to the author of this Report and Recommendation. On March 14, 2003, I considered the application and affidavit submitted by Agent Mace and issued the arrest warrant in my capacity as a United States Magistrate Judge for the District of Idaho.

[2] The other remaining Defendant is the United States of America. The pending cross-motions for summary judgment between al-Kidd and the United States will be addressed in a separate Report and Recommendation, which will be issued within the week. (*See* Dkt. 333, 250, 74, 79 85,230, 248.)

**REPORT AND RECOMMENDATION - 2**

determination.

The Court conducted a hearing on the motions on May 10, 2012. After careful consideration of the parties' submissions and arguments, and for the reasons discussed below, the Court first recommends that al-Kidd's motion seeking summary judgment against Agent Gneckow be granted and Agent Gneckow's motion for summary judgment be denied. Pursuant to the reasoning of *Franks v. Delaware,* 438 U.S. 154 (1978), the Court concludes that Agent Gneckow is not entitled to qualified immunity because he drafted the affidavit and decided what information to include and what to exclude from the affidavit. With the omitted and corrected information, the application and affidavit would not have been supported by probable cause.

As to Agent Mace, who made the formal application for the warrant to this Court on behalf of Agent Gneckow and who simply received the factual information for inclusion in the affidavit, the Court will request that the District Court conduct a de novo review of the application and affidavit upon which the warrant was based. Based on the District Court's findings following the de novo review, then one of the following rulings could result:

1. If the District Court finds the application and affidavit submitted to this Court established probable cause to arrest al-Kidd as a material witness, then Agent Mace's motion for summary judgment should be granted and al-Kidd's motion denied.

2. If the District Court finds that the application and affidavit did not even established an indicia of probable cause, then al-Kidd's motion for summary judgment

**REPORT AND RECOMMENDATION - 3**

should be granted and Agent Mace's motion denied.

3.  If the District Court concludes that the application and affidavit fell within the range where there was more than an indicia of probable cause, but less than legally sufficient probable cause, then this Court would recommend that the District Court find Agent Mace is entitled to qualified immunity in seeking the warrant, and grant Agent Mace's motion for summary judgment and deny al-Kidd's motion.

## REPORT

## FACTS

The Court is well versed in the facts over the course of this matter's history. Since the existence of probable cause to arrest al-Kidd as a material witness, or the lack thereof, is of crucial importance in the resolution of the motions before the Court, a detailed account of the events leading up to the request for the material witness arrest warrant and the information submitted in support of the application will be discussed.  Based on the parties' statements of fact, the Court finds the following facts material and undisputed.[3]

Al-Kidd's claim that he was improperly arrested as a material witness flows from a three-year criminal investigation and the thirty-three day jury trial of Sami Omar al-Hussayen ("al-Hussayen"), which concluded on June 10, 2004. Al-Hussayen, a citizen of Saudi Arabia, had been admitted to the United States on a student visa and was a computer science Ph.D. student at the University of Idaho, with emphasis on computer

---

[3] The Court takes judicial notice of the record in *U.S. v. al-Hussayen*, Case No. 3:03-cr-00048-EJL, in connection with the motions. The Court presided over all pretrial proceedings in the al-Hussayen matter, including the arraignment and subsequent detention hearing of al-Hussayen.

security and intrusion techniques. FBI Special Agent Michael Gneckow was the lead agent investigating the scope of al-Hussayen's business and other activities, aside from his university studies. Al-Hussayen had been allowed to enter the United States solely as a full time student, and the FBI was investigating whether he had been engaging in business activities that would contravene the limitations of his student visa.

During the course of the three year investigation, in December of 2001, Agent Gneckow became aware of al-Kidd's relationship with al-Hussayen. (Gneckow Depo. at 57–69, Dkt. 306-5 at 54–56.)[4] Surveillance was conducted of al-Kidd. (Gneckow Depo. at 76, Dkt. 306-5 at 61.)

In the fall of 2001, Agent Gneckow obtained documents indicating that money from one of al-Hussayen's bank accounts had been transferred to al-Kidd. (Gneckow Depo. at 54, Dkt. 306-5 at 51.) Agent Gneckow later determined that the transfers to al-Kidd probably constituted regular monthly salary payments made by al-Hussayen to al-Kidd for work al-Kidd did for an entity called al-Multaqa and its website, al-multaqa.com.[5] (Gneckow Depo. at 70, 76, 78, Dkt. 306-5 at 57, 61, 63.)

As part of the investigation, Agent Joe Cleary interviewed al-Kidd twice, and on both occasions al-Kidd voluntarily participated in the interviews. Agent Cleary discussed the interviews with Agent Gneckow. The FBI determined that, in its view, al-Kidd

---

[4] Because of the voluminous nature of the record, the Court will cite to documents submitted without reference to the record attachments and page numbers, as none were provided, and will instead include the Docket Number and corresponding page number of the docket entry.

[5] *See* Defs.' Statement of Facts ¶ 6, Dkt. 306-2.

**REPORT AND RECOMMENDATION - 5**

possessed material information relating to al-Hussayen's activities that could be useful in their investigation.

Following the second interview, al-Kidd spoke to a reporter with the Seattle Post-Intelligencer. Later, on August 2, 2002, an article in the paper asserted that the FBI was investigating charitable donations by Muslim students at the University of Idaho and Washington State University for possible links to international terrorism. The article discussed a "source" described as a "former University of Idaho football player and part of a "small Muslim community in Moscow and nearby Pullman" between 1992 and 2000. (Defs.' Ex. 2, Dkt. 306-3 at 6.) The FBI agents involved with the investigation decided against future contact with al-Kidd out of concern that the case against al-Hussayen could be compromised if their conversations were discussed with the media. (Gneckow Depo. at 195, Dkt. 306-5 at 110; Defs.' Statement of Facts ¶¶ 10–12, Dkt. 306-2.)

Although contact with al-Kidd ceased after August 2, 2002, Agent Gneckow at that point in time knew al-Kidd was a citizen of the United States and had converted to Islam. (Gneckow Depo. at 79–80, Dkt. 306-5 at 64–65.) Agent Gneckow knew also that al-Kidd had a wife and son, a mother residing in Kent, Washington, and that al-Kidd had attended the University of Idaho and played football for the University. (Gneckow Depo. at 156–57, Dkt. 306-5 at 82–83.)

After a lengthy investigation into al-Hussayen's activities, on February 13, 2003, an eighteen page, eleven count indictment, was filed against al-Hussayen in the District of

REPORT AND RECOMMENDATION - 6

Idaho.[6] The Government's position is that, at the time it requested the warrant for the arrest of al-Kidd as a material witness, the prosecutor believed al-Kidd could provide material testimony in support of the charges in the indictment.

The evidence al-Kidd could provide at trial is best analyzed by first reviewing the facts the Grand Jury found supported probable cause to return the indictment. The indictment, paragraphs 1–28, set forth the facts the Grand Jury found in support of the eleven counts of visa fraud and making false statements to the United States. The essence of the visa fraud charges is that al-Hussayen entered the United States for purposes other than solely pursuing his studies, such as providing material support for the Islamic Assembly of North America ("IANA") and other web-site and business activities. The indictment recounted that large sums of money were being transferred to and from bank accounts controlled by al-Hussayen to the IANA, as well as to individuals and groups in the Middle East.

The factual summary of the indictment focused the criminal charges on the years 1999, 2000 and 2002, when al-Hussayen submitted various Immigration and Naturalization Forms in connection with his student visa application, in which he stated he was submitting his application "solely for pursuing a full course of study at the [University of Idaho.] However, the indictment included statements that from

---

[6]   The original indictment was superceded and ultimately included charges that al-Hussayen had provided material support to terrorism. Al-Hussayen was eventually acquitted on those particular charges, but the jury was unable to reach a verdict on the visa fraud and false statement charges contained in the original indictment.

**REPORT AND RECOMMENDATION - 7**

approximately December of 1994 to approximately July of 2002, al-Hussayen used the money in his bank accounts to travel and fund travel for others, including travel related to the IANA, and to travel to locations in various states as well as in foreign countries.[7]

The indictment alleged that on January 14, 2002, in addition to the F-1 student visa, al-Hussayen submitted a DOS Form 157 requiring him to list "all Professional, Social, and Charitable Organizations to Which You Belong (Belonged) or Contribute (Contributed) or with Which You Work (Have Worked)." The indictment states that al-Hussayen listed only the Association for Computive Machinery and the Institute of Electrical Engineers, but failed to list the Islamic Assembly of North America and other entities to which he belonged.

Paragraphs 17–21 set forth the web-site activities that al-Hussayen was involved with, including that he was the registered agent of IANA in Idaho. Paragraph 19 listed eleven websites for which al-Hussayen was either the sole registered agent, the administrative contact person, head of the supervisory committee, or the contact person.

The indictment described in paragraphs 22 – 28 the financial and business activities the Grand Jury found probable cause to believe that al-Hussayen had been involved with while he was in the United States on his student visa. Since August of 1994, he had maintained six bank accounts in various states.  From 1997 until the filing of the indictment, he had used the accounts to transfer or cause to be transferred large sums

---

[7] The indictment states that between August 7, 1994 and September 1998, al-Hussayen studied in the United States as a foreign student.

**REPORT AND RECOMMENDATION - 8**

of money to IANA and individuals. Specifically, the Grand Jury found that al-Hussayen had received an additional $300,000 apart from the funds that could be traced directly to payment for al-Hussayen's university studies. Although the indictment contained facts that the Government would have to prove beyond a reasonable doubt at trial, the facts stated in the indictment provide the backdrop to the investigation of and eventual application for al-Kidd's arrest as a material witness.[8]

Agent Gneckow believed al-Kidd had information germane to the visa fraud charges, al-Hussayen's status as a student, and al-Hussayen's involvement with the IANA. (Gneckow Depo. at 157, Dkt. 306-5 at 84.) Importantly, al-Kidd may have been able to talk about al-Multaqa in relation to the other websites mentioned in the indictment, specifically how much time al-Hussayen was spending on those websites and the amount of work required to build and maintain the websites in light of al-Hussayen's representation he was a full time student. (Gneckow Depo. at 157–58, Dkt. 306-5 at 84–85.)

Al-Hussayen's detention hearing was held on March 11 and 12, 2003, and within hours of its conclusion, Agent Gneckow received information that al-Kidd was flying to Saudi Arabia and leaving in a few days. (Gneckow Depo. at 147, Dkt. 306-5 at 79.) Agent Gneckow believed that all appearances indicated al-Kidd was fleeing to avoid being called as a witness at trial. (Gneckow Depo. at 148, Dkt. 306-5 at 80.) Based on his

---

[8] Plaintiff was never considered as a criminal suspect by the FBI. (Gneckow Dep. At 73-75, Dkt. 306.5 at 58-60.)

REPORT AND RECOMMENDATION - 9

experience, Agent Gneckow knew at the time that Saudi Arabia did not have an extradition treaty with the United States. (Gneckow Depo. at 148, Dkt. 306-5 at 80.) The al-Hussayen trial was scheduled for April 15, 2003. (Defs.' Statement of Facts ¶ 34, Dkt. 306-2.) What Agent Gneckow did not know, and which al-Kidd argues was because of Agent Gneckow's inadequate investigation, was that al-Kidd had made plans to travel to Saudi Arabia to further his course of study in Arabic language and Islamic law, and had begun making arrangements to do so beginning in April of 2002. (al-Kidd Depo. at 112–114, 132–33, Dkt. 306-4 at 64–67 and Dkt. 308-5 at 15–16; Pl.'s Statement of Facts ¶ 11–13, Dkt. 310-2 at 5.)

The specific information Agent Gneckow received on March 13, 2003, from Immigration and Customs Enforcement Agent Robert Alvarez prompting the decision to seek a material witness warrant was that al-Kidd had purchased a one-way ticket, first class, to Saudi Arabia, leaving within a few days and that it cost approximately $5,000. (Gneckow Depo. at 163–64, Dkt. 306-5 at 87–88; Defs.' Statement of Facts ¶ 8, Dkt. 306-2.) Gneckow suggested a material witness warrant to "stop al-Kidd from leaving the country." (Gneckow Depo. at 165, Dkt. 306-5 at 89.) Agent Gneckow followed up by contacting the FBI at Dulles airport to confirm al-Kidd's departure. (Gneckow Depo. at 167, Dkt. 306-5 at 91.) However, Agent Gneckow did not confirm the price of the ticket, or whether it was first class or one way. (Gneckow Depo. at 169–70, Dkt. 306-5 at 93–94.) Al-Kidd had actually purchased the ticket on March 6, 2003, for less than $2,000, and it was an open ended coach class ticket with no scheduled return date. (Defs.'

**REPORT AND RECOMMENDATION - 10**

Statement of Facts ¶ 14, 21, Dkt. 306-2.)

Prior to seeking the arrest of al-Kidd, Agent Gneckow had never sought a material witness warrant. (Gneckow Depo. at 128, Dkt. 306-5 at 67.) Agent Gneckow consulted with the Government's primary trial attorney in the pending al-Hussayen case, Assistant United States Attorney Kim Lindquist ("AUSA Lindquist"), who raised a concern with Agent Gneckow about whether al-Kidd was still at his home in Kent, Washington. (Gneckow Depo. at 142, Dkt. 306-5 at 76.) Agent Gneckow undertook efforts to locate al-Kidd, although he could not recall what efforts were in fact made to confirm al-Kidd was no longer at his home. (Gneckow Depo. at 143–44, Dkt. 306-5 at 77–78.) Later, Agent Gneckow had AUSA Lindquist review the draft affidavit, and he "absolutely rel[ied] on Kim Lindquist to make sure" the elements of the material witness warrant were met. (Gneckow Depo. at 185, Dkt. 306-5 at 103.)

The two page application for the warrant itself was based upon a three page affidavit and the eighteen page, eleven count indictment of Sami Omar al-Hussayen filed on February 13, 2003. The affidavit stated that, based upon al-Kidd's "demonstrated involvement" with al-Hussayen, "he is believed to be in possession of information germane to this matter which will be crucial to the prosecution." (Dkt. 307-3 at 39.)  The affidavit concluded with the statement that if al-Kidd "travels to Saudi Arabia, the United States Government will be unable to secure his presence at trial via subpoena."

The first ten pages of the al-Hussayen indictment for visa fraud and making false statements to the United States set forth the facts the Grand Jury had found during their

investigation of al-Hussayen.  These "indictment" facts, in addition to the "affidavit"

facts, constituted the basis for the material witness warrant for al-Kidd on the grounds

that he was about to board a plane for Saudi Arabia and that he could provide material

testimony to support the criminal charges against al-Hussayen.

The affidavit stated that during the course of the investigation, information was

developed regarding the involvement of al-Kidd with al-Hussayen. The affidavit went on

to recite that al-Kidd, aka Lavoni T. Kidd, had received from al-Hussayen "in excess of

$20,000" between March 2000 and November 2001. The affidavit discussed that al-Kidd

had traveled to Yemen between August of 2001 and April of 2002; that upon his return

al-Kidd met with al-Hussayen's associates and emptied out a storage facility in Moscow,

Idaho; that personal items belonging to al-Kidd were recovered by the FBI from the

storage facility; and that these personal items included a program for an IANA conference

held in December 1994, a hotel receipt from Sacramento, California, dated April 26,

2001, identifying al-Kidd's company as Al-Multaqa, and telephone numbers for IANA in

Ann Arbor, Michigan and for Basem Khafagi, a former Director of the IANA, who had

been recently arrested.

Concerning al-Kidd's departure, the affidavit states, in relevant part:

> Kidd is scheduled to take a one-way, first class flight (costing
> approximately $5,000.00) to Saudi Arabia on Sunday, March 16, 2003, at
> approximately 6:00 EST. He is scheduled to fly from Dulles International
> Airport to JFK International Airport in New York and then to Saudi Arabia.

(Dkt. 307-3).

**REPORT AND RECOMMENDATION - 12**

As previously mentioned, the affidavit was prepared by Agent Gneckow. According to him, it was not relevant that al-Kidd was a citizen of the United States, that he had a family, including a wife and son living in the United States, or that al-Kidd had cooperated with the FBI in the past. In his view, it was also not relevant that al-Kidd had never been told by the FBI not to travel outside of the United States or to contact the FBI if he intended to do so. Therefore, that information was not included in the affidavit. (Gneckow Depo. at 194, Dkt. 306-5 at 109.)

Agent Mace was the duty agent in Boise on March 14, 2003, and was tasked with presenting the warrant to a magistrate judge in Boise because neither Agent Gneckow nor a judge were available in Northern Idaho, in particular Coeur d'Alene, Idaho, where Agent Gneckow was stationed. (Gneckow Depo. at 138, Dkt. 306-5 at 72.) The only information Agent Mace added to the affidavit in support of the arrest warrant application was the first paragraph, identifying that the affidavit was based upon facts he acquired from Agent Gneckow. (*Id.*; Aff. of Mace, Dkt. 307-3 at 37.) Otherwise, the entirety of the affidavit was based upon information acquired by Agent Gneckow and other law enforcement agents. (Aff. of Mace, Dkt. 307-3 at 73.) Agent Mace was not involved in the investigation of al-Hussayen, and had no independent knowledge of al-Kidd. (Defs.' Statement of Facts ¶ 29, Dkt. 306-2.)

Al-Kidd was arrested in Virginia on March 16, 2003, and eventually transferred to Boise, Idaho, arriving on March 25, 2003. (Defs.' Statement of Facts ¶ 31–32, Dkt. 306-2.) That same day, al-Kidd briefly met with a Federal Public Defender before appearing

**REPORT AND RECOMMENDATION - 13**

in front of this Court. (Defs.' Statement of Facts ¶ 31–32 Dkt. 306-2.)

A detention hearing was held on March 31, 2003, and following the hearing al-Kidd was released into the custody of his wife in Nevada. (*United States v. Sami Omar al-Hussayen,* Case No. 3:03-cr-00048-EJL, Dkt. 40, ¶ 103). The conditions of his release included surrender of his passport, limitation of travel to four states, reporting to a probation officer in Idaho and Nevada as directed, and home visits. (Case No. 3:03-cr-00048-EJL, Dkt. 40, ¶ 103). Al-Hussayen's trial was continued until January 13, 2004, and after the government filed its superseding indictment on January 9, 2004, the trial was continued again to April 14, 2004. (Defs.' Statement of Facts ¶ 34, Dkt. 306-2.)

AUSA Lindquist made the decision not to call al-Kidd as a witness because of the defense strategy that became apparent as the trial progressed, which was not to contest that al-Hussayen had engaged in business activities on behalf of IANA. (Defs.' Statement of Facts ¶ 35, Dkt. 306-2.) Consequently, the government never called al-Kidd to testify and his release conditions were removed on June 16, 2004. (*U.S. v. al-Hussayen*, 3:03-cr-00048-EJL, Dkt. 680).

## ANALYSIS

### 1.    Summary Judgment Standards

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex*

**REPORT AND RECOMMENDATION - 14**

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the non-moving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to

**REPORT AND RECOMMENDATION - 15**

support a jury verdict in his favor. *Id*. at 526–57. The non-moving party must go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

When, as here, parties submit cross-motions for summary judgment, "each motion must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 136 (9th Cir. 2001). The Court must therefore review the evidence submitted in support of each cross-motion. *Id.*

But the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist*., 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed.R.Civ.P. 56(c)(2). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). If the contents of the evidence could

be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n. 3 (9th Cir. 1995). The Ninth Circuit Court of Appeals "has repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc*., 854 F.2d 1179, 1182 (9th Cir. 1988).

## 2.   Material Witness Statute

Title18 U.S.C. § 3144 permits the detention of a material witness "[i]f it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena." Because probable cause is required before a warrant will issue, an application for a material witness warrant must establish probable cause to believe that (1) the witness's testimony is material, and (2) it may become impracticable to secure the presence of the person by subpoena. *United States v. Awadallah*, 349 F.3d. 42, 64 (2nd Cir. 2003) (citing *Bacon v. United States*, 449 F.2d 933, 942-43 (9th Cir. 1971)). Both materiality and impracticability must be satisfied to establish probable cause. *Awadallah*, 349 F.3d at 64.

**REPORT AND RECOMMENDATION - 17**

3. **Qualified Immunity**

The doctrine of qualified immunity protects federal and state officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, __ U.S. __, 131 S.Ct. 2074, 2080 (2011). Courts considering the qualified immunity question have discretion to decide which of the two prongs of the qualified immunity analysis to decide first. *Pearson v. Callahan*, 129 S.Ct. 808, 821-22 (2009).

The Fourth Amendment protects the right of persons to be free from unreasonable searches and seizures, including arrests. *Ashcroft*, 131 S.Ct. at 2080. An arrest, including one pursuant to the federal material-witness statute, 18 U.S.C. § 3144, must therefore be objectively reasonable in order to pass constitutional muster. *Ashcroft*, 131 S.Ct. at 2080; *See also Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012) ("The 'shield of immunity' otherwise conferred by the warrant will be lost, for example, where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.").

While it is true that review of an affidavit by one's superiors or a prosecuting attorney and issuance by a neutral magistrate judge does not automatically render an officer's conduct reasonable, the Supreme Court has recently made it clear that third party review is not irrelevant to the objective reasonableness of the officer's determination that the warrant was valid. As the Supreme Court stated, "[t]he fact that the officers secured

these approvals is certainly pertinent in assessing whether they could have held a

reasonable belief that the warrant was supported by probable cause." *Messerschmidt,* 132

S.Ct. at 1250.  However, if a warrant is so lacking in probable cause that official reliance

is unreasonable, the officer executing the warrant "cannot excuse his own default by

pointing to the greater incompetence of the magistrate." *KRL v. Estate of Moore*, 512 F.3d

1184, 1190 (9th Cir. 2008). Probable cause is examined based upon the facts and

circumstances known to the officer at the time of the arrest. *Wilson v. City of Coeur

d'Alene*, No. 2:09-cv-381-EJL, 2010 WL 4853342 *5 (D. Idaho Nov. 19, 2010) (citing

*Grant v. City of Long Beach*, 315 F.3d 1081, 1085 (9th Cir. 2002)).

**4.      Cross-Motions For Summary Judgment as to Agent Gneckow**

Al-Kidd presents two arguments why Agent Gneckow's motion for summary

judgment should be denied and why his motion should be granted.  The first argument is

that the affidavit was facially deficient and Agent Gneckow is not be entitled to immunity

under *Malley v. Briggs,* 475 U.S. 335 (1986). The second argument is that Agent

Gneckow is liable under *Franks v. Delaware,* 438 U. S.  154 (1978), for preparing an

affidavit based upon false and misleading statements. Considering Agent Gneckow

prepared the warrant and the affidavit, the claim under *Franks* is the logical starting point

in the analysis as to Agent Gneckow.

###        A.      *The* <u>*Franks*</u> *Claim as to Agent Gneckow*

Ordinarily, a search or seizure pursuant to a warrant is presumed valid. *Awadallah*,

349 F.3d at 64. However, if the affidavit is based on false statements and misleading

**REPORT AND RECOMMENDATION - 19**

omissions, or both, a subsequent arrest would be unconstitutional. In *Franks*, the United States Supreme Court held that a defendant may challenge a warrant by making a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit, and that the allegedly false statement was necessary to the finding of probable cause. *Franks*, 438 U.S. at 155–56. *Franks* has since been applied with equal strength to omissions of material facts. By reporting less than the total story, an affiant can "manipulate the inferences a magistrate will draw," and "to allow a magistrate to be misled in this manner could denude the probable cause requirement of all real meaning." *U.S. v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985); *see also Bender v. City of Seattle*, 664 P.2d 492, 500 (Wash. 1983) (stating that an officer may not cleanse a transaction by supplying only those facts favorable to the issuance of a warrant.)

Although statements recited in an application for a warrant do not have to be truthful in the sense that every statement is correct, the statements must be truthful "in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 164–65. The defendant must allege deliberate falsehood or reckless disregard for the truth, specifically pointing out the portions of the warrant affidavit claimed to be false; "[a]llegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

In 2003, the time of the events here, the law was clearly established that the United States Constitution did not permit a police officer deliberately, or with reckless disregard

**REPORT AND RECOMMENDATION - 20**

for the truth, to make material misrepresentations or omissions to obtain a warrant that would otherwise be without probable cause. *Miller v. Prince George's Cnty., MD*, 475 F.3d 621, 632 (4th Cir. 2007); *see also Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1295 (9th Cir. 1999) ("a police officer who recklessly or knowingly includes false material information in, or omits material information from, a search warrant affidavit 'cannot be said to have acted in an objectively reasonable manner.'"). Accordingly, if there is a *Franks* violation, no issue of qualified immunity can ever be raised by a law enforcement officer in defense of his position.

When faced with a motion for summary judgment by a police officer in a case involving a *Franks* claim, a plaintiff need only "establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information ... the affidavit is insufficient to establish probable cause." *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir.1995). The Court will now turn to whether al-Kidd has raised a valid *Franks* challenge with respect to Agent Gneckow, considering he was involved with the investigation and drafted the affidavit for Agent Mace to present.

Al-Kidd alleges that Agent Gneckow deliberately or recklessly included facts about his plane ticket which were not true, and omitted facts that were material to the probable cause determination. With respect to his plane ticket, al-Kidd had an open ended *round trip* ticket to Saudi Arabia with no scheduled return date, coach class, which cost approximately $2,000, not a first class, one-way ticket that cost $5,000. As for the alleged

**REPORT AND RECOMMENDATION - 21**

omissions, al-Kidd asserts that the affidavit did not inform the magistrate judge that al-Kidd: (1) had voluntarily cooperated with the FBI on multiple occasions in the past; (2) was a native-born United States citizen with a wife, son, and other family living in the United States; (3) had not been informed that his testimony might be needed or that he should not travel; (4) had not been informed that if he decided to travel overseas he should first advise the FBI; and (5) had not been contacted by the FBI in over eight months.

Based upon the above allegations, Al-Kidd has made the requisite showing not only to survive the Government's motion for summary judgment, but also with respect to his own motion. The Court finds the statements about the plane ticket, coupled with the omissions about al-Kidd's citizenship, family, past cooperation, and the FBI's failure to contact him, were material to the probable cause determination regarding the impracticability of securing al-Kidd's presence at trial by subpoena. Had the information been included, the affidavit would not have been supported by probable cause under the totality of the circumstances.

Defendants admit that the information about the plane ticket, which was the only information in the affidavit regarding impracticability, was not true. Defendants argue, however, that even if the correct information about the plane ticket—that it was open ended (not one way), economy (not first class), and cost $2,000 (not $5,000)—was included in the affidavit, the information was not material to the probable cause determination. The Government claims al-Kidd was a flight risk regardless of the type of

**REPORT AND RECOMMENDATION - 22**

ticket he had simply because al-Kidd was leaving the country for an indefinite period of time. But Defendants fail to consider the totality of the information in the affidavit juxtaposed with the information about the plane ticket.

Probable cause to determine that it would be impracticable to secure al-Kidd's presence at trial by subpoena depended entirely upon the inference that al-Kidd was leaving the country, possibly returning home to Saudi Arabia, and was "involved" with suspected terrorists or terrorist activity, thus leading to the assumption he was a flight risk and was, in fact, fleeing the country on the eve of trial and just days after the indictment was returned against al-Hussayen. Considering the affidavit as a whole, the information included about the plane ticket, coupled with the information chosen to link al-Kidd to al-Hussayen, is misleading and highly suggestive of illicit involvement with criminal activity, inferring a motive to flee.

First, the affidavit identified al-Kidd by his Muslim name, and absent any information about al-Kidd's family background, his name was suggestive of foreign birth. In addition, by referring to him as "also known as" Lavoni T. Kidd, the affidavit cast suspicion, without further explanation, that al-Kidd had possibly changed his name once he was in the United States to a more "American" sounding name for some nefarious purpose. The truth was that al-Kidd had changed his birth name of "Lavoni T. Kidd" to "Abdullah al-Kidd" when he converted to Islam. Finally, the affidavit referenced the indictment against al-Hussayen, who was identified as a Saudi Arabian citizen in the indictment, and al-Kidd's "involvement" with al-Hussayen, again suggesting that al-Kidd

**REPORT AND RECOMMENDATION - 23**

may have been a citizen of Saudi Arabia.

The affidavit stated that the investigation of al-Hussayen was conducted by the Inland Northwest Joint Terrorism Task Force, suggesting that al-Kidd was involved with a suspected terrorist. Moreover, the affidavit identified that al-Kidd received "in excess of $20,000" from al-Hussayen, but did not mention what the money was for or how it was paid to al-Kidd, thereby inferring he could have received more than $20,000, including the $5,000 for his first class plane ticket. The indictment also included information that al-Hussayen had funded travel for individuals in the past. Finally, the affidavit indicated al-Kidd had traveled to Yemen in 2002, and upon returning to the United States met with al-Hussayen's associates and emptied a storage facility, again suggestive of a trip taken at someone else's direction as well as casting suspicion on the purpose of the trip by juxtaposing it with the emptying of the storage locker. Further, the information the FBI recovered from the storage locker included a telephone number for another Saudi individual recently arrested in New York.

Taken as a whole, the information included in the affidavit, together with the incorrect flight information, was highly suggestive that al-Kidd was a Saudi national involved with suspected terrorists, with no ties to the United States, fleeing the country within one month of the al-Hussayen indictment. Further, al-Kidd's flight was on the heels of the arrest of another suspected terrorist whom it appeared he knew, on an expensive first class ticket, possibly purchased with funds received from al-Hussayen

**REPORT AND RECOMMENDATION - 24**

after al-Hussayen had been indicted.[9]

Although an affiant cannot be expected to include in an affidavit every piece of information gathered during the course of his investigation, a finding that the omissions were "designed to mislead" or made in "reckless disregard of whether they would mislead" the magistrate judge satisfies the intent element under *Franks*. *United States v. Awadallah*, 349 F.3d 42, 67–68 (2nd Cir. 2003) (citing *United States v. Colkley*, 899 F.2d 297, 300–301 (4th Cir. 1990). Further, the nature of the omissions themselves may suggest concealment. *Awadallah*, 349 F.3d at 68, n.20. *See also Colkley*, 899 F.2d at 301 (recognizing that courts may infer intent or recklessness from the fact of omission itself).

Properly corrected and supplemented, the paragraph about the impracticability of securing al-Kidd's presence at trial with a subpoena would have been expanded to read that: al-Kidd, a United States citizen with a wife, a son, and other family in the United States, was traveling to Saudi Arabia to attend a university on an open ended coach class ticket; that al-Kidd had previously met with FBI agents and cooperated with questioning; that the FBI had made no attempt to contact al-Kidd in the previous eight months of an otherwise extensive and protracted investigation; and that the FBI had never asked al-Kidd not to leave the United States without first advising them of his intent to do so.

The omitted information about al-Kidd would have put a reasonable magistrate judge on notice that al-Kidd may have been a cooperative witness, with no intention of

---

[9] Al-Kidd notes in his brief that the affidavit cast him in a suspicious light. (Pl.'s Mem. at 13, Dkt. 310-1 at 17.)

**REPORT AND RECOMMENDATION - 25**

fleeing the United States to evade testifying, and that consideration should have been given to the less drastic alternative of issuing a subpoena rather than arrest.[10] *See Liston v Cnty. of Riverside*, 120 F.3d 965, 974 (9th Cir. 1997). But by omitting the facts favorable to al-Kidd which should have been presented to a magistrate judge, the affidavit was "cleansed." Had a magistrate judge been given the omitted information, he may have inquired of the agents about their attempt prior to seeking the warrant to contact either al-Kidd or his wife and family to question them about al-Kidd's upcoming travel. If Agent Gneckow had inquired, he might have learned that al-Kidd's plans were to attend university, and included periodic returns to the United States during semester breaks. (al-Kidd Depo. at 112, Dkt. 308-5 at 7.) Accordingly, the Court holds al-Kidd has demonstrated that had the correct information about the plane ticket and the omitted facts been included, a magistrate judge would not simply have issued the warrant without more probing inquiry.

Defendants argue that Agent Gneckow is shielded because he reasonably relied upon information provided to him by other law enforcement officials concerning al-Kidd's plane ticket to Saudi Arabia. However, the false information about the plane ticket was only one factor giving rise to the inference that al-Kidd was a flight risk.

Agent Gneckow had led the three-year investigation into the activities of al-

---

[10] Al-Kidd argues that the affidavit must establish that the FBI tried to serve him with a subpoena before obtaining the warrant. However, a court in the exercise of its sound discretion has the power to issue a warrant of arrest, not preceded by a subpoena, for a material witness. *United States v. Anfield,* 539 F.2d 674, 677 (9th Cir. 1976).

**REPORT AND RECOMMENDATION - 26**

Hussayen and, since 2001, of al-Kidd. Prior to the February 2003 indictment and the

issuance of the arrest warrant one month later, al-Kidd had been the subject of

surveillance. Agent Gneckow knew that the $20,000 received by al-Kidd was likely

salary payment, received in monthly increments over a period of time, for work related to

al-Kidd's employment with al-Multaqa, not a one time sum.

Agent Gneckow had ruled out al-Kidd as a suspect for criminal activity once he

and others had determined there was nothing worth investigating as far as the money flow

was concerned. Yet the manner in which the affidavit was crafted suggested anything

other than innocent activity. Agent Gneckow chose to characterize the money al-Kidd

received as "payments," not salary, "in excess of $20,000." The characterization of the

payments indicated al-Kidd could have received the $5,000 for his plane ticket in a lump

sum from al-Hussayen, especially considering the indictment detailed how al-Hussayen

funded travel for others. The affidavit was further crafted in such a way so as to cast

doubt upon al-Kidd's motives for leaving the country by mentioning his travel to Yemen,

and the subsequent emptying of a storage locker, both of which could have been innocent

activities.

Al-Kidd was interviewed twice in the summer of 2002, both times agreeing to

speak voluntarily. Thus, agents knew how to contact al-Kidd. Yet when the decision was

made to seek the material witness warrant, Agent Gneckow could not recall the specific

effort made to locate al-Kidd after more than eight months without any contact. When

told about al-Kidd's travel, he asked no questions about al-Kidd's intinerary, even though

**REPORT AND RECOMMENDATION - 27**

he was not given a specific departure date from Agent Alvarez. Agent Gneckow undertook follow up by contacting the FBI agent at Dulles airport, but did not confirm any details about the ticket price or type of ticket. Had he done so, Agent Gneckow could very well have obtained sufficient information that would have led him to question his assumption about the reasons for al-Kidd's trip to the Middle East.

Agent Gneckow also did not consider the fact that al-Kidd was a United States citizen with family, instead taking a myopic view that the only relevant fact was al-Kidd's imminent departure out of the country. And although agents were under pressure to act quickly considering al-Kidd was scheduled to depart in a few days, when agents did not locate al-Kidd at his home in Washington, no effort was made to contact al-Kidd's family members, wife or mother to learn about the purpose for al-Kidd's travel. Instead, Agent Gneckow assumed al-Kidd was fleeing the country upon hearing about the plane ticket and never thought al-Kidd should first be contacted and asked if the trip could be postponed.

The bottom line is that Agent Gneckow assumed al-Kidd was a flight risk based on the first class, one-way ticket, even though he had no other concrete information upon which to cross-check his assumption. The failure to take a few additional steps in an otherwise extremely lengthy and thorough investigation spanning over three years was, in the Court's view, reckless.

Agent Gneckow cannot in this case absolve himself of his own inaction by relying upon AUSA Lindquist, whom he said reviewed the affidavit before it was presented to

REPORT AND RECOMMENDATION - 28

this Court. Although consultation with one's superiors is relevant to the objective

reasonableness of an officer's determination that a warrant is valid, an officer is not

automatically insulated by the shield of qualified immunity simply because someone

else—whether a judge or prosecutor— had approved the application. *See Messerschmidt*

*v. Millender*, ___ U.S. ___, 132 S.Ct. 1235, 1250 (2012). In its decision overruling

*Millender v. County of Los Angeles*, 620 F.3d 1016 (9th Cir. 2010), in which the Ninth

Circuit had failed to consider consultation with superiors relevant, *Messerschmidt* noted

that:

> [b]efore seeking to have the warrant issued by a magistrate, Messerschmidt
> *conducted an extensive investigation* into Bowen's background and the
> facts of the crime. *Based on this investigation, Messerschmidt prepared a*
> *detailed warrant application* that truthfully laid out the pertinent facts. The
> only facts omitted—the officers' knowledge of Bowen's arrest and
> conviction records, . . . would only have strengthened the warrant.
> Messerschmidt then submitted the warrant application for review by
> Lawrence, another superior officer, and a deputy district attorney, all of
> whom approved the application without any apparent misgivings. Only after
> this did Messerschmidt seek the approval of a neutral magistrate, who
> issued the requested warrant. The officers thus "took every step that could
> reasonably be expected of them."

*Messerschmidt*, 132 S.Ct. at 1250 (italics added). In contrast, Agent Gneckow's conduct

was not reasonable. His failure to conduct any further investigation beyond simply

receiving the information from Agent Alvarez resulted in an affidavit that was lacking in

details and did not truthfully lay out the pertinent facts. Agent Gneckow's conduct

therefore resulted in an affidavit crafted with a reckless disregard as to whether it would

mislead a magistrate judge in his probable cause finding regarding the impracticability of

**REPORT AND RECOMMENDATION - 29**

securing al-Kidd's presence at trial by a subpoena.[11]

**B.      *The <u>Malley</u> Claim as to Agent Gneckow***

Because the Court finds a *Franks* violation as to Agent Gneckow's conduct, the

Court determines it is not necessary to also discuss al-Kidd's claim that the affidavit

supporting the warrant was facially deficient under *Malley,* as applied to Agent Gneckow.

**C.      *Recommendation***

The Court would recommend that al-Kidd's motion for summary judgment against

Agent Gneckow be granted and Agent Gneckow's motion be denied.

**5.      Cross-Motions for Summary Judgment as to Agent Mace**

Al-Kidd presents the same two arguments for summary judgment against Agent

Mace as he does against Agent Gneckow: first that the application and affidavit in support

of the warrant were facially deficient and Mace is not entitled to immunity under *Malley*;

and second, that Agent Mace should be held liable under *Franks* for the same false

statements and omissions in the affidavit drafted by Agent Gneckow. Again, the alleged

*Franks* violation will be addressed first.

**A.      *The <u>Franks</u> Claim as to Agent Mace***

Al-Kidd argues that Agent Mace was under a legal obligation to investigate all of

the facts contained in the affidavit to ensure there were no false statements or omissions

---

[11] Because the undisputed material facts establish al-Kidd's *Franks* claim on the element of impracticability, the Court finds it unnecessary to consider the materiality prong of 18 U.S.C. § 3144 as to Agent Gneckow, since both materiality and impracticability must be shown before a material witness warrant may be issued.

**REPORT AND RECOMMENDATION - 30**

of material facts. The Court disagrees. In general, officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting assistance provided the magistrate judge the information required to support an independent judicial assessment of probable cause. *Shiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971). Because Agent Gneckow was unable to present his affidavit in person, he relayed the information to Agent Mace in Boise. Agent Mace had no involvement in the investigation, no independent knowledge of al-Kidd, and was nothing other than the duty agent in Boise on March 14, 2003. Considering Agent Gneckow was the primary investigating officer of the al-Hussayen matter for over three years and had knowledge of al-Kidd, under the circumstances Agent Mace was entitled to rely upon Agent Gneckow's information.

Agent Mace contributed nothing to the affidavit other than informing this Court that he received the information from Agent Gneckow. There is no indication that Agent Mace distrusted the information provided by Agent Gneckow. He had no reason to know that the affidavit contained false statements or failed to include other information that might have been pertinent to the Court's probable cause determination.

For these reasons, the Court finds that al-Kidd's *Franks* claim against Agent Mace cannot, as a matter of law, satisfy the *Franks* requirements. There is an absence of any facts that Agent Mace knowingly and intentionally, or with reckless disregard for the truth, included a false statement or omitted pertinent facts.

**REPORT AND RECOMMENDATION - 31**

**B.**     ***The <u>Malley</u> Claim as to Agent Mace***

The Court's finding that Agent Mace cannot be liable under *Franks* does not end the inquiry with respect to his liability. Al-Kidd's claim that the affidavit supporting the arrest was facially deficient under *Malley v. Briggs*, 475 U.S. 335 (1986), is applicable to Agent Mace. He reviewed the affidavit prior to presenting it to this Court. He was the last person in the chain of events before the application and affidavit were presented to the Court, and therefore he should have considered whether the application and affidavit, in the form presented, should have been presented to a magistrate judge for issuance of the warrant.

**(1)     *Request For De Novo Review by District Court***

Al-Kidd first argues that the affidavit in support of the warrant was so facially and patently deficient that it failed to establish probable cause. However, al-Kidd's claim directly challenges whether probable cause was established, despite review of the affidavit by AUSA Lindquist and its ultimate approval by this Court.

As previously stated, this Court reviewed the application and affidavit on March 14, 2003, and determined that probable cause existed to issue the warrant for al-Kidd's arrest. A claim that the affidavit was so facially deficient so as to lack any indicia of probable cause would require this Court to revisit its own initial determination and, as argued by al-Kidd, reach the opposite conclusion that the application and affidavit did not meet the probable cause standard. In other words, al-Kidd's argument would compel a

**REPORT AND RECOMMENDATION - 32**

conclusion that not only Agent Mace was "plainly incompetent," but also that AUSA Lindquist, who reviewed the warrant in its final form at Agent Gneckow's request, and this Court, were as well. While judges are at times requested to reconsider their earlier decisions, the Court believes another approach would be more appropriate in this case.

At oral argument, the Court advised counsel that rather than making a recommendation on the argument that the affidavit was facially deficient, the Court would request that the District Court make a de novo determination of the probable cause issue. The following constitutes a report of the factual information this Court considered in making the initial determination that the arrest warrant was supported by probable cause to find that al-Kidd's testimony was material and that it would be impracticable to secure his presence at trial by subpoena. After reviewing this information the District Court can reach a legal conclusion of whether or not the warrant was supported by probable cause.

(a)     *Information the Court Considered Relevant to Materiality*

The application and affidavit incorporated the al-Hussayen indictment, and therefore this Court considered both the "indictment" facts and the "affidavit" facts contained in the application. The indictment states that in the years 1999, 2000 and 2002, al-Hussayen submitted various Immigration and Naturalization Forms representing that he wanted to enter the United States solely to pursue a full course of study at the University of Idaho. The indictment alleges that these were false statements and in

**REPORT AND RECOMMENDATION - 33**

contravention of al-Hussayen's student visa, because al-Hussayen was engaged in a variety of business activities not related to his studies. The indictment alleges that al-Hussayen was engaged in computer web-site activities that exceeded his course of studies, including expert computer services, advice, assistance and support to organizations, including the IANA.

The indictment states that al-Hussayen was the formal registered agent for IANA in Idaho, and further that al-Hussayen had telephonic contact with many individuals in several states, including IANA, who maintain it offices in Ann Arbor, Michigan. The indictment alleges also that on January 14, 2002, in addition to the F-1 student visa, al-Hussayen submitted a DOS Form 157 where he was required to list "all Professional, Social, and Charitable Organizations to Which You Belong (Belonged) or Contribute (Contributed) or with Which You Work (Have Worked). Instead, the indictment alleges that al-Hussayen listed only the Association for Computive Machinery and the Institute of Electrical Engineers and failed to list the IANA and other entities to which he belonged.

The indictment went back further, stating that from about December 1994 to about July 2002, al-Hussayen, through several bank accounts in various states, funded travel for other individuals, including travel to events related to IANA. It states also that he funded travel for individuals to locations in various states as well as foreign countries.

The application and affidavit for the arrest of al-Kidd averred that al-Kidd could provide crucial evidence to support the criminal charges made in the indictment against

**REPORT AND RECOMMENDATION - 34**

al-Hussayen. To determine whether there was a fair probability, to paraphrase the probable cause standard, that al-Kidd could provide testimony on these allegations, it is necessary then to evaluate the statements in the affidavit presented to the Court, and consider the testimony the prosecution could have elicited from al-Kidd at trial as to the charges in the indictment.

The affidavit states that from March 2000 to November 2001, an individual identified as al-Kidd and/or his spouse, Nadine Zegura, received payments from al-Hussayen and his associates in excess of $20,000. The affidavit recounted al-Kidd's travel to Sana'a Yemen in August 2001, and that he remained there until April 2002, when he returned to Moscow, Idaho and met with al-Hussayen's associates.

Questioning of al-Kidd at trial could elicit testimony as to the circumstances under which and the reasons why he received the money from al-Hussayen, and whether the funds received were related to al-Hussayen's university studies or his business activities. As to al-Kidd's earlier travel to Yemen, the prosecution could question whether al-Hussayen funded al-Kidd's travel based upon the allegations in the indictment that al-Hussayen was funding international travel for certain individuals.

The affidavit states that after al-Kidd returned from Yemen he emptied a storage locker in Moscow, Idaho and that several of his personal documents were left behind. One item was a conference program for the second annual IANA conference held in Dearborn, Michigan, in December 1994. Paragraph 27 of the indictment expressly asserts that from at least December 1994, the same month as the conference brochure, al-

Hussayen funded travel for individuals relating to IANA events. In presenting proof on these allegations, the Government could ask al-Kidd if he attended the IANA conference in December of 1994 and if al-Hussayen paid for the trip, providing proof that al-Hussayen was engaging in business activities in alleged contravention to the limitation of his student visa.

The affidavit mentions also that one of the personal documents found at al-Kidd's storage facility included the Michigan telephone numbers for IANA. The prosecution could question al-Kidd about his contacts with IANA and his knowledge of al-Hussayen's involvement with IANA. The facts elicited could support the allegations in the indictment that al-Hussayen was providing material computer and financial support to IANA that were not connected with his course of studies.

Another telephone number found at al-Kidd's storage facility and described in the affidavit was the telephone number of Basem Khafagi, a former University of Idaho student and former director of IANA. The affidavit stated that Kafagi had recently been arrested in New York. The indictment alleged the al-Hussayen had telephonic contact with a number of individuals associated with IANA. Questioning al-Kidd as to why he had Basem Khafagi's telephone number and what conversations al-Kidd may have had with Basem Khafagi could tie in with other evidence the prosecution would be presenting as to the positions and responsibilities that al-Hussayen had with IANA.

**REPORT AND RECOMMENDATION - 36**

(b)   *Information the Court Considered Relevant to Impracticability*

Title 18 U.S.C. § 3144 frames the issue of impracticability as whether it "*may* become impracticable to secure the presence of the person by subpoena . . ." (Emphasis added). The affidavit presented to the Court on March 14, 2003, stated that al-Kidd was scheduled to take a one-way, first class flight, (costing approximately $5,000) to Saudi Arabia on Sunday, March 16, 2003. It was also stated that if al-Kidd traveled to Saudi Arabia, the United States Government would be unable to secure his presence at trial via subpoena. At the time the affidavit was presented, the trial was due to commence in thirty-two days.

Al-Kidd relies on *Bacon v. United States*, 449 F.2d 933 (9th Cir. 1971), in asserting that the preceding facts do not establish impracticability. In *Bacon*, the witness had fled to a roof top in response to the FBI's appearance at her door for questioning. The FBI gave chase, and because of her actions together with her access to large sums of money and her acquaintance with fugitives from justice, the FBI feared she would evade judicial process.

The court in *Bacon* declined to find that the facts supported probable cause to believe that Bacon could not practicably be brought before the grand jury by a subpoena. *Bacon*, 449 F.2d at 945. In contrast, as represented in the affidavit presented to the Court, al-Kidd's efforts had gone well beyond speculation as to what he might do in the future, because he had actually purchased a one-way plane ticket and was about to board an

**REPORT AND RECOMMENDATION - 37**

airplane bound for the Middle East in the midst of an investigation involving suspected terrorists, and if he left, he could not be subpoenaed to return to the United States for trial.

(c)     *Summary*

In *Malley*, the United States Supreme Court framed the issue of what standard to apply to the officer's conduct and held that an officer is not entitled to qualified immunity if the warrant application is "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley*, 475 U.S. at 344–45. The defendant's conduct is viewed from an standard of "objective reasonableness." *Id*. at 341. Therefore, Agent Mace "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.*

After reviewing the factual information in the application and affidavit, as to both materiality and impracticability, the District Court can determine if these statements are legally sufficient to establish  probable cause for the arrest of al-Kidd. If they do establish probable cause, Agent Mace's motion for summary judgment should be granted and al-Kidd's motion denied.  If after conducting its review, the District Court concludes that the application and affidavit are completely lacking in any indicia of probable cause, then al-Kidd's motion for summary judgment should be granted.

**(2)     *Is Agent Mace Entitled to Qualified Immunity.***

The Supreme Court in *Malley* describes that, in the event a magistrate judge acts mistakenly in issuing a warrant based upon less than probable cause, but within the range of professional competence of a magistrate, the officer who requested the warrant would

**REPORT AND RECOMMENDATION - 38**

not be liable if a reasonably well-trained officer would not have known that the affidavit failed to establish probable cause and he should not have applied for the warrant. *Malley* 475 U.S. at 345–56, and n.9.

When confronted with a *Malley* claim in *Messerschmidt v. Millender*, ___ U.S. ___, 132 S.Ct. 1235, 1245 (2012), the Supreme Court reaffirmed that qualified immunity protects an officer for his mistaken judgment that an application and affidavit in support of a warrant was supported by probable cause. *Messerschmidt*, 132 S.Ct. at 1249–50. In other words, "if officers of reasonable competence could disagree on this issue [of probable cause], immunity should be recognized." *Malley*, 475 U.S. at 341. This question can only be answered by "a close parsing of the warrant application . . . and the affidavit." *Messerschmidt*, 132 S.Ct. at 1250.

Reconciling *Malley* and *Messerschmidt,* it would appear that the Supreme Court is describing a zone lying between two extremes, for example where an affidavit established at least an indicia of probable cause but fell short of legal probable cause. That zone encompasses an affidavit that was still lacking probable cause even though it contained a collection of facts but had been mistakenly issued by the magistrate judge. Under such circumstances, the Court would then examine whether the officer is entitled to qualified immunity as stated in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), and *United States v. Leon*, 468 U.S. 986 (1984).

Viewing Agent Mace's actions within this zone to determine if they were objectionably reasonable directs this Court to the conclusion that he would be entitled to

**REPORT AND RECOMMENDATION - 39**

qualified immunity. He had no knowledge that false statements had been made in the affidavit or that material facts had been omitted. The affidavit had been reviewed for probable cause by an AUSA and a second AUSA accompanied Agent Mace when he presented the application and affidavit to this Court. After reviewing the application and affidavit, this Court found probable cause and issued the arrest warrant.

As the Supreme Court stated, the shield of immunity will only be lost if the defect is "obvious from the face of the warrant," and "just a simple glance" would have revealed its existence. *Messerschmidt,* 132 S.Ct. at 1250.  The question in such circumstances is whether the magistrate judge "so obviously erred that any reasonable officer would have recognized the error. The occasions on which this standard will be met may be rare, but so too are the circumstances in which it will be appropriate to impose personal liability on a lay officer in the face of judicial approval of his actions." *Messerschmidt,* 132 S.Ct. at 1250.[12] As noted, review by a neutral magistrate is the clearest indication that officers acted in an objectively reasonable manner, or in "objective good faith."  *Messerschmidt,* 132 S.Ct. at 1245. In other words, in an ordinary case, an officer cannot be expected to question the magistrate judge's probable cause determination, because it is the magistrate judge's responsibility to determine whether the allegations in an affidavit establish probable cause , and if so, to issue the warrant. *Id.*

---

[12]  The Supreme Court's example of an instance where this extreme was present was *Groh v. Ramirez,* 540 U.S. 551 (2004). In *Groh,* the officers who carried out a warrant-approved search were not entitled qualified immunity because the warrant completely failed to describe the items to be seized. *Messerschmidt,* 132 S.Ct. at 1250.

**REPORT AND RECOMMENDATION - 40**

Assuming the District Court reaches this level in the analysis, I would recommend that Agent Mace be found to have qualified immunity for his actions and that his motion for summary judgment be granted and al-Kidd's motion be denied.

## CONCLUSION

The Court cannot consider the affidavit, and the statements made therein, in a vacuum. Under the totality of the circumstances, which included Agent Gneckow's investigation and the facts he knew, coupled with the lack of any reasonable inquiry to confirm his assumption al-Kidd was fleeing from authorities, the Court concludes based on the undisputed material facts that Al-Kidd is entitled to judgment as a matter of law on his *Franks* claim against Agent Gneckow.

However, with respect to Agent Mace, the duty officer in charge on March 14, 2003, absent any independent knowledge, or any reason to doubt the veracity of Agent Gneckow's recitation of the facts as they related to the indictment, the Court concludes that the undisputed material facts establish Agent Mace cannot be liable under *Franks*. The District Court has been requested to conduct a *de novo* review to determine if the application and affidavit on their face established probable cause to arrest al-Kidd.  If the District Court concludes that there was probable cause, then Agent Mace's motion for summary judgment should be granted and al-Kidd's motion denied. If the District Court concludes that the application and affidavit do not even support an indicia of probable cause, then al-Kidd's motion for summary judgment should be granted and Agent Mace's motion denied.

**REPORT AND RECOMMENDATION - 41**

If the District Court determines that the application and affidavit fall within a zone where there is more than an indicia of probable cause but less than legal probable cause, this Court would recommend that Agent Mace be found to have qualified immunity from al-Kidd's claims. Under those circumstances, Agent Mace's motion for summary judgment should be granted and al-Kidd's motion denied.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)  That Plaintiff's Cross-Motion for Summary Judgment (Dkt. 310) as to Agent Gneckow be **GRANTED.**

2)  That Defendants' Motion for Summary Judgment (Dkt. 306) as to Agent Gneckow be **DENIED.**

3)  That as to Agent Mace, Defendants' Motion for Summary Judgment (Dkt. 306) and Plaintiff's Cross-Motion for Summary Judgement (Dkt. 310) be decided by the District Court following **DE NOVO REVIEW**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **June 18, 2012**

Honorable Mikel H. Williams
United States Magistrate Judge

**REPORT AND RECOMMENDATION - 43**