UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ABDULLAH AL-KIDD,<br><br>                     Plaintiff,<br><br>v.<br><br>ALBERTO  GONZALES, Attorney General<br>of the United States; *et al.*,<br><br>                     Defendants. | Case No.  1:05-cv-00093-EJL-MHW<br><br>**REPORT AND RECOMMENDATION<br>ON CROSS MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>**UNITED STATES** |

**INTRODUCTION**

Before the Court are the cross-motions for summary judgment by the Plaintiff Abdullah

al-Kidd and the United States of America. (Dkt. 307, 308.) These are the last motions currently

pending in the case Plaintiff Abdullah al-Kidd ("al-Kidd") has brought in this jurisdiction

stemming from his allegations that he was unlawfully arrested and held as a material witness in

the case of *United States v. Sami Omar al-Hussayen,* Case No. 3:03-cr-00048-EJL, then pending

in the United States District Court for the District of Idaho.

At the time of his arrest on March 16, 2003, al-Kidd, a United States citizen who

converted to Islam while studying at the University of Idaho, was about to board a flight

leaving from Dulles Airport in Virginia bound for Saudi Arabia, where he was going to continue his religious studies at Umm al-Qora University. Al-Kidd was arrested on a material witness warrant issued by this Court1 based upon an affidavit presented by agents of the Federal Bureau of Investigation ("FBI") on the grounds that al-Kidd's testimony was necessary to the prosecution of the *al-Hussayen* case, and he was about to leave the United States on the eve of trial. Individual defendants Scott Mace and Michael Gneckow ("Agent Mace" and "Agent Gneckow") are the agents who sought and presented the application for the material witness warrant.2 (*See* Dkt. 333, 250, 74, 79, 85, 230, 248.)

Al-Kidd's remaining claims against the United States are asserted under the Federal Tort Claims Act. He claims false imprisonment based upon his initial arrest, premised upon the conduct of Agents Mace and Gneckow. The United States argues it is entitled to summary judgment because al-Kidd's claims are barred by the discretionary function exception and prosecutorial immunity, and alternatively because the warrant was supported by probable cause. Al-Kidd argues to the contrary, contending he was falsely imprisoned since the warrant was not supported by probable cause. As to the abuse of process claim, al-Kdid asserts that the Attorney General and federal prosecutors were using the material witness warrant to take individuals like al-Kidd into custody as part of

---

[1] When the term "the Court" is used in this Report and Recommendation, the term refers to the author of this Report and Recommendation. On March 14, 2003, I considered the application and affidavit submitted by Federal Bureau of Investigation Agent Scott Mace, and I issued the arrest warrant in my capacity as a United States Magistrate Judge for the District of Idaho.

[2] The pending cross-motions for summary judgment between al-Kidd and the individual defendants are addressed in a separate Report and Recommendation.

**REPORT AND RECOMMENDATION - 2**

their on-going criminal investigation of the individual, and not solely to secure their testimony and attendance at trial.

The Court conducted a hearing on the motions on May 10, 2012. After careful consideration of the parties' submissions and arguments, and for the reasons discussed below, the Court recommends that al-Kidd's motion seeking summary judgment against the United States be granted in part and denied in part. In its Report and Recommendation issued on June 18, 2012, the Court recommended that al-Kidd's motion for summary judgment be granted as to Agent Gneckow for his role in recklessly crafting the affidavit that included false information and material omissions. Based on that recommendation, the Court recommends that al-Kidd's motion for summary judgment regarding his claim for false imprisonment be granted. As to the abuse of process claim, the Court finds there are disputed issues of material fact precluding summary judgment for either party. Finally, the Court finds the United States cannot establish as a matter of law that al-Kidd's claims are barred by the discretionary function exception or prosecutorial immunity. The Court's analysis is presented more fully below.

## REPORT

### FACTS

The Court has discussed at length in its companion Report and Recommendation the facts that it finds are undisputed. Those facts are incorporated by reference as if fully set forth herein. (*See* Dkt. 336.) The following facts, however, are material and undisputed for purposes of resolving the motions relating to the United States.

Al-Kidd's claim that he was improperly arrested as a material witness flows from a three-year criminal investigation and the thirty-three day jury trial of Sami Omar al-Hussayen ("al-Hussayen"),3 which concluded on June 10, 2004. Al-Hussayen, a citizen of Saudi Arabia, had been admitted to the United States on a student visa and was a computer science Ph.D. student at the University of Idaho, with emphasis on computer security and intrusion techniques. FBI Special Agent Michael Gneckow was the lead agent investigating the scope of al-Hussayen's business and other activities, aside from his university studies. Al-Hussayen had been allowed to enter the United States solely as a full time student, and the FBI was investigating whether he had been engaging in business activities that would contravene the limitations of his student visa.

During the course of the three year investigation, in December of 2001, Agent Gneckow became aware of al-Kidd's relationship with al-Hussayen. (Gneckow Depo. at

---

3 The Court takes judicial notice of the record in U.S. v. al-Hussayen, Case No. 3:03-cr-00048-EJL, in connection with the motions. The Court presided over all pretrial proceedings in the al-Hussayen matter, including the arraignment and subsequent detention hearing of al-Hussayen.

57–69, Dkt. 306-5 at 54–56.)4 Surveillance was conducted of al-Kidd. (Gneckow Depo. at 76, Dkt. 306-5 at 61.)

Agent Joe Cleary obtained approval to open an intelligence investigation of al-Kidd on December 13, 2001. (Def.'s Stmt. of Facts ¶¶ 2, 4, Dkt. 307-2.) Agent Cleary had also asked Immigration and Customs Enforcement to enter a "lookout" for al-Kidd into the Treasury Enforcement Communications System ("TECS") to track al-Kidd's international travel. (*Id.* ¶ 8.)

In the fall of 2001, Agent Gneckow had obtained documents indicating that money from one of al-Hussayen's bank accounts had been transferred to al-Kidd. (Gneckow Depo. at 54, Dkt. 306-5 at 51.) Agent Gneckow later determined that the transfers to al-Kidd probably constituted regular monthly salary payments made by al-Hussayen to al-Kidd for work al-Kidd did for an entity called al-Multaqa and its website, al-multaqa.com.5 (Gneckow Depo. at 70, 76, 78, Dkt. 306-5 at 57, 61, 63.)

As part of the investigation, Agent Joe Cleary interviewed al-Kidd twice, and on both occasions al-Kidd voluntarily participated in the interviews. Agent Cleary discussed the interviews with Agent Gneckow. The FBI determined that, in its view, al-Kidd possessed material information relating to al-Hussayen's activities that could be useful in their investigation.

Following the second interview, al-Kidd spoke to a reporter with the Seattle Post-Intelligencer. Later, on August 2, 2002, an article in the paper asserted that the FBI was

---

4 Because of the voluminous nature of the record, the Court will cite to documents submitted without reference to the record attachments and page numbers, as none were provided, and will instead include the Docket Number and corresponding page number of the docket entry.

5 *See* Defs.' Statement of Facts ¶ 6, Dkt. 306-2.

**REPORT AND RECOMMENDATION - 5**

investigating charitable donations by Muslim students at the University of Idaho and Washington State University for possible links to international terrorism. The article discussed a "source" described as a "former University of Idaho football player and "part of a small Muslim community in Moscow and nearby Pullman" between 1992 and 2000. (Defs.' Ex. 2, Dkt. 306-3 at 6.) The FBI agents involved with the investigation decided against future contact with al-Kidd out of concern that the case against al-Hussayen could be compromised if their conversations were discussed with the media. (Gneckow Depo. at 195, Dkt. 306-5 at 110; Defs.' Statement of Facts ¶¶ 10–12, Dkt. 306-2.)

Although contact with al-Kidd ceased after August 2, 2002, Agent Gneckow at that point in time knew al-Kidd was a citizen of the United States and had converted to Islam. (Gneckow Depo. at 79–80, Dkt. 306-5 at 64–65.) Agent Gneckow knew also that al-Kidd had a wife and son, a mother residing in Kent, Washington, and that al-Kidd had attended the University of Idaho and played football for the University. (Gneckow Depo. at 156–57, Dkt. 306-5 at 82–83.)

After a lengthy investigation into al-Hussayen's activities, on February 13, 2003, an eighteen page, eleven count indictment, was filed against al-Hussayen in the District of Idaho. The Government's position is that, at the time it requested the warrant for the arrest of al-Kidd as a material witness, the prosecutor believed al-Kidd could provide material testimony in support of the charges in the indictment.

Agent Gneckow believed al-Kidd had information germane to the visa fraud charges, al-Hussayen's status as a student, and al-Hussayen's involvement with the Islamic Assembly of North America ("IANA"). (Gneckow Depo. at 157, Dkt. 306-5 at 84.) Importantly, al-Kidd may have been able to discuss al-Multaqa in relation to the

**REPORT AND RECOMMENDATION - 6**

other websites mentioned in the indictment, specifically how much time al-Hussayen was spending on those websites and the amount of work required to build and maintain the websites in light of al-Hussayen's representation he was a full time student. (Gneckow Depo. at 157–58, Dkt. 306-5 at 84–85.)

Al-Hussayen's detention hearing was held on March 11 and 12, 2003, and within hours of its conclusion, Agent Gneckow received information that al-Kidd was flying to Saudi Arabia and leaving in a few days. (Gneckow Depo. at 147, Dkt. 306-5 at 79.) Agent Gneckow believed that all appearances indicated al-Kidd was fleeing to avoid being called as a witness at trial. (Gneckow Depo. at 148, Dkt. 306-5 at 80.) Based on his experience, Agent Gneckow knew at the time that Saudi Arabia did not have an extradition treaty with the United States. (Gneckow Depo. at 148, Dkt. 306-5 at 80.) The al-Hussayen trial was scheduled for April 15, 2003. (Defs.' Statement of Facts ¶ 34, Dkt. 306-2.) What Agent Gneckow did not know, and which al-Kidd argues was because of Agent Gneckow's inadequate investigation, was that al-Kidd had made plans to travel to Saudi Arabia to further his course of study in Arabic language and Islamic law, and had begun making arrangements to do so beginning in April of 2002. (al-Kidd Depo. at 112–114, 132–33, Dkt. 306-4 at 64–67 and Dkt. 308-5 at 15–16; Pl.'s Statement of Facts ¶ 11–13, Dkt. 310-2 at 5.)

The specific information Agent Gneckow received on March 13, 2003, from Immigration and Customs Enforcement Agent Robert Alvarez prompting the decision to seek a material witness warrant was that al-Kidd had purchased a one-way ticket, first class, to Saudi Arabia, leaving within a few days and that it cost approximately $5,000. (Gneckow Depo. at 163–64, Dkt. 306-5 at 87–88; Defs.' Statement of Facts ¶ 8, Dkt.

306-2.) Agent Gneckow followed up on Agent Alvarez's information by contacting the FBI at Dulles airport to confirm al-Kidd's departure. (Gneckow Depo. at 167, Dkt. 306-5 at 91.) However, Agent Gneckow did not confirm the price of the ticket, or whether it was first class or one way. (Gneckow Depo. at 169–70, Dkt. 306-5 at 93–94.) Al-Kidd had actually purchased the ticket on March 6, 2003, for less than $2,000, and it was an open ended coach class ticket with no scheduled return date. (Defs.' Statement of Facts ¶ 14, 21, Dkt. 306-2.)

Within minutes of hearing the information from Agent Alvarez, Agent Gneckow suggested a material witness warrant to "stop al-Kidd from leaving the country." (Gneckow Depo. at 165, Dkt. 306-5 at 89.) But prior to seeking the arrest of al-Kidd, Agent Gneckow had never sought a material witness warrant. (Gneckow Depo. at 128, Dkt. 306-5 at 67.) And although the final decision whether to seek the material witness warrant rested with Assistant United States Attorney Kim Lindquist ("AUSA Lindquist"), it was Agent Gneckow who recommend to the U.S. Attorney's Office that it seek the material witness arrest warrant in the first instance. (Def's. Statement of Facts ¶ 22-23 (Dkt. 306-2.) Agent Gneckow consulted with Agent Cleary before making this recommendation, and then called AUSA Lindquist to recommend that the Government seek the warrant. *Id*.

AUSA Lindquist raised a concern with Agent Gneckow about whether al-Kidd was still at his home in Kent, Washington. (Gneckow Depo. at 142, Dkt. 306-5 at 76.) Agent Gneckow undertook efforts to locate al-Kidd, although he could not recall what efforts were in fact made to confirm al-Kidd was no longer at his home. (Gneckow Depo. at 143–44, Dkt. 306-5 at 77–78.) Later, Agent Gneckow had AUSA Lindquist review the

REPORT AND RECOMMENDATION - 8

draft affidavit, and he "absolutely rel[ied] on Kim Lindquist to make sure" the elements of the material witness warrant were met. (Gneckow Depo. at 185, Dkt. 306-5 at 103.)

The two page application for the warrant itself was based upon a three page affidavit and the eighteen page, eleven count indictment of Sami Omar al-Hussayen filed on February 13, 2003. The affidavit stated that, based upon al-Kidd's "demonstrated involvement" with al-Hussayen, "he is believed to be in possession of information germane to this matter which will be crucial to the prosecution." (Dkt. 307-3 at 39.)  The affidavit concluded with the statement that if al-Kidd "travels to Saudi Arabia, the United States Government will be unable to secure his presence at trial via subpoena."

The first ten pages of the al-Hussayen indictment for visa fraud and making false statements to the United States set forth the facts the Grand Jury had found during their investigation of al-Hussayen.  These "indictment" facts,6 in addition to the "affidavit" facts, constituted the basis for the material witness warrant for al-Kidd on the grounds that he was about to board a plane for Saudi Arabia and that he could provide material testimony to support the criminal charges against al-Hussayen.

The affidavit stated that during the course of the investigation, information was developed regarding the involvement of al-Kidd with al-Hussayen. The affidavit went on to recite that al-Kidd, aka Lavoni T. Kidd, had received from al-Hussayen "in excess of $20,000" between March 2000 and November 2001. The affidavit discussed that al-Kidd had traveled to Yemen between August of 2001 and April of 2002; that upon his return al-Kidd met with al-Hussayen's associates and emptied out a storage facility in Moscow,

---

6 The facts set forth in the Indictment which the Court considered are discussed at length in the Court's companion Report and Recommendation, (Dkt. 336), and will not be repeated in their entirety for sake of brevity.

**REPORT AND RECOMMENDATION - 9**

Idaho; that personal items belonging to al-Kidd were recovered by the FBI from the

storage facility; and that these personal items included a program for an IANA

conference held in December 1994, a hotel receipt from Sacramento, California, dated

April 26, 2001, identifying al-Kidd's company as Al-Multaqa, and telephone numbers for

IANA in Ann Arbor, Michigan and for Basem Khafagi, a former Director of the IANA,

who had been recently arrested.

Concerning al-Kidd's departure, the affidavit states, in relevant part:

> Kidd is scheduled to take a one-way, first class flight (costing
> approximately $5,000.00) to Saudi Arabia on Sunday, March 16, 2003, at
> approximately 6:00 EST. He is scheduled to fly from Dulles International
> Airport to JFK International Airport in New York and then to Saudi Arabia.

(Dkt. 307-3).

As previously mentioned, the affidavit was prepared by Agent Gneckow.

According to him, it was not relevant that al-Kidd was a citizen of the United States, that

he had a family, including a wife and son living in the United States, or that al-Kidd had

cooperated with the FBI in the past. In his view, it was also not relevant that al-Kidd had

never been told by the FBI not to travel outside of the United States or to contact the FBI

if he intended to do so. Therefore, that information was not included in the affidavit, and

he did not provide AUSA Lindquist with any information that was not ultimately

included in the affidavit. (Gneckow Depo. at 194, Dkt. 306-5 at 109; Pl.'s Statement of

Facts ¶ 38, Dkt. 308-2; Defs.' Response ¶ 38, Dkt. 322-1.)

Agent Mace was the duty agent in Boise on March 14, 2003, and was tasked with

presenting the warrant to a magistrate judge in Boise because neither Agent Gneckow nor

a judge were available in Northern Idaho, in particular Coeur d'Alene, Idaho, where

Agent Gneckow was stationed. (Gneckow Depo. at 138, Dkt. 306-5 at 72.) The only information Agent Mace added to the affidavit in support of the arrest warrant application was the first paragraph, identifying that the affidavit was based upon facts he acquired from Agent Gneckow. (Id.; Aff. of Mace, Dkt. 307-3 at 37.) Otherwise, the entirety of the affidavit was based upon information acquired by Agent Gneckow and other law enforcement agents. (Aff. of Mace, Dkt. 307-3 at 73.) Agent Mace was not involved in the investigation of al-Hussayen, and had no independent knowledge of al-Kidd. (Defs.' Statement of Facts ¶ 29, Dkt. 306-2.)

Al-Kidd was arrested in Virginia on March 16, 2003, and eventually transferred to Boise, Idaho, arriving on March 25, 2003. (Defs.' Statement of Facts ¶ 31–32, Dkt. 306-2.) That same day, al-Kidd briefly met with a Federal Public Defender before appearing in front of this Court. (Defs.' Statement of Facts ¶ 31–32 Dkt. 306-2.)

 A detention hearing was held on March 31, 2003, and following the hearing al-Kidd was released into the custody of his wife in Nevada. (*United States v. Sami Omar al-Hussayen*, Case No. 3:03-cr-00048-EJL, Dkt. 40, ¶ 103). The conditions of his release included surrender of his passport, limitation of travel to four states, reporting to a probation officer in Idaho and Nevada as directed, and home visits. (Case No. 3:03-cr-00048-EJL, Dkt. 40, ¶ 103). Al-Hussayen's trial was continued until January 13, 2004, and after the government filed its superseding indictment on January 9, 2004, the trial was continued again to April 14, 2004. (Defs.' Statement of Facts ¶ 34, Dkt. 306-2.)

AUSA Lindquist made the decision not to call al-Kidd as a witness because of the defense strategy that became apparent as the trial progressed, which was not to contest that al-Hussayen had engaged in business activities on behalf of IANA. (Defs.' Statement

of Facts ¶ 35, Dkt. 306-2.) Consequently, the government never called al-Kidd to testify and his release conditions were removed on June 16, 2004. (*U.S. v. al-Hussayen*, 3:03-cr-00048-EJL, Dkt. 680).

Although al-Kidd was, according to Agent Gneckow and AUSA Lindquist, never regarded as a criminal suspect or as a possible subject for indictment, there is evidence in the record reflecting how the Government viewed al-Kidd. (Pl.'s Statement of Facts ¶ 5, Dkt. 308-2; Defs.' Response ¶5 Dkt. 322-1.) Al-Kidd remained the subject of an intelligence investigation until 2004. (*Id.*) AUSA Lindquist identified a docketing document which, in its caption, identified al-Kidd as an individual suspected of international terrorism. (Lindquist Depo. at 49—54, Dkt. 308-4 at 237—242.)[7] The Government contends that the appearance of al-Kidd's name in the title of an FBI document does not necessarily mean that the person was suspected of engaging in criminal activity. (Defs.' Response ¶ 5, Dkt. 322-1.) FBI Headquarters received updates regarding the investigation of al-Kidd. (Pl.'s Statement of Facts ¶7, Dkt. 308-2; Defs.' Response ¶ 7, Dkt. 322-1.)

When al-Kidd was arrested at the Dulles airport on March 16, 2003, agents took al-Kidd to a police station in the airport and, with Agent Gneckow's consent, interrogated him. (Pl.'s Statement of Facts ¶ 15; Defs.' Response ¶15.) FBI agents searched al-Kidd's belongings, and seized his laptop. Later, FBI agents drafted a search warrant application to search al-Kidd's laptop, and although it was not served it avers that al-Kidd's computer contained evidence in support of criminal activity "as to … al-Kidd." (*Id.* ¶16.)

---

[7]  The Government raised an evidentiary objection to the admissibility of the docketing document which is addressed later in this Report and Recommendation. (Defs.' Response ¶ 5, Dkt. 322-1 at 2.)

Within days of al-Kidd's arrest, FBI Director Robert Mueller testified before Congress that al-Kidd's arrest—along with that of Khalid Sheikh Mohammed, a "mastermind" of the September 11th attacks—was a "major success[]" in the government's anti-terrorism efforts. Director Mueller never mentioned that Plaintiff was arrested as a witness. The Government has never been able to explain why Director Mueller's testimony highlighted al-Kidd. (*Id.* ¶17.)

During his fifteen day transport to Idaho, al-Kidd was incarcerated in three different facilities in Virginia, Oklahoma, and Idaho. Each time he was transferred, al-Kidd was shackled with handcuffs, leg restraints, and a belly chain. Al-Kidd was strip-searched multiple times over the course of his detention. In Virginia, he was held under high-security conditions, often spending 22 to 23 hours a day in his cell. In the detention center in Oklahoma, al-Kidd was made to remove his clothes and sit naked in view of other, fully clothed detainees. (*Id.* ¶18-20.)

At al-Kidd's detention hearing, conducted on March 26, 2003, the Government opposed his release, contending that al-Kidd was "dangerous." (*Id.* ¶ 43.)

**REPORT AND RECOMMENDATION - 13**

ANALYSIS[8]

1.      **Summary Judgment Standards**

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of

summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986). Material facts are those that may affect the outcome of the case. *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party,

and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-

movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152,

1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable

inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th

Cir. 1988).

---

[8] Under the FTCA, liability is determined by the tort law of the state where the claim arose. *Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994). Because al-Kidd's claims are based on the procurement of an arrest warrant in Idaho and the claims arose in Idaho, Idaho law applies.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Id.* at 526–57. The non-moving party must go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

When, as here, parties submit cross-motions for summary judgment, "each motion must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 136 (9th Cir. 2001). The Court must therefore review the evidence submitted in support of each cross-motion. *Id.*

But the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts*." So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed.R.Civ.P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of the plaintiff's diary on summary judgment because at trial, the plaintiff's testimony of contents would not be hearsay).

Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). The Ninth Circuit Court of Appeals "has repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988).

## 2. The Prosecutorial Immunity and Discretionary Function Exceptions Do Not Apply

### A. Prosecutorial Immunity

The Government argues that Assistant United States Attorney Kim Lindquist decided to actually seek the material witness arrest warrant for al-Kidd, and was responsible for all subsequent decisions regarding whether to call him at the al-Hussayen trial based upon the defense strategy that unfolded. The Government contends these are typical judgment calls made by federal prosecutors and as such, these decisions are protected by prosecutorial immunity.

**REPORT AND RECOMMENDATION - 16**

The doctrine of prosecutorial immunity shields a prosecutor from civil suit for damages under Section 1983 in initiating a prosecution and presenting the case, provided the activities were intimately associated with the judicial phase of the criminal process. *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). The Government cites to several cases, including *Adams v. Hanson*, 656 F.3d 397 (6th Cir. 2011), for its argument that prosecutorial immunity applies here.

But the logic of the Government's argument fails in this case, because al-Kidd is not relying upon AUSA Lindquist's conduct, but rather Agent Gneckow's decision to pursue the warrant in the first instance. Although AUSA Lindquist approved the application and affidavit for the warrant that was later presented to the Court, Agent Gneckow controlled the information presented to Lindquist for review. While Lindquist may be shielded from a civil suit for damages, Agent Gneckow is not. To allow the Government to rely solely upon AUSA Lindquist's conduct, and argue that the agents are absolved from suit because Agent Gneckow sought approval, would prevent any claim against the agents in this case. Prosecutorial immunity therefore does not apply under the facts and circumstances before the Court.

### B.    Discretionary Function Exception

The discretionary function exception states that the FTCA does not permit recovery for claims arising from the "exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The government bears the burden of showing that the discretionary function exception applies. *Reed v. U.S. Dept. of Interior*, 231 F.3d 501, 504 (9th Cir. 2000).

**REPORT AND RECOMMENDATION - 17**

The United States Supreme Court has dictated a two-part test to determine whether the discretionary function applies. *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). First, the court must determine whether the action is a matter of choice for the employee, such that it involves an element of judgment or choice. *Id*. Second, the exception only applies to actions based on considerations of public policy. *Id.* at 537. Therefore, the government is shielded from liability when the challenged action "involves the permissible exercise of policy judgment." *Id*. The purpose of the discretionary function exception is to prevent judicial second-guessing of administrative decisions based in social, economic, and political policy. *United States v. Gaubert*, 499 U.S. 315, 323 (1991). When determining whether the discretionary function applies, the court should examine the conduct in question, not the status of the actor. *Berkovitz*, 123 F.3d at 536.

In its earlier Memorandum Order denying the Government's motion to dismiss, filed on September 18, 2006, the District Court held that the discretionary function exception based upon the prosecutor's decision to seek the warrant did not apply to the claims raised in the complaint, because al-Kidd alleged that Agents Mace and Gneckow improperly used the warrant for investigative, not prosecutorial, decisions. (Dkt. 78 at 14.) The Court then examined whether the discretionary function exception would apply to the actions of the investigative officers. The Court explained generally that police investigations also are protected by the discretionary function exception because they involve policy considerations. *See Alfrey v. United States*, 276 F.3d 557 (9th Cir. 2002). The Ninth Circuit has held that "the discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long

as the agency does not violate a mandatory directive." *Vickers v. United States*, 228 F.3d 944, 951 (9th Cir. 2000). This protection is afforded because federal investigations often require the officers to consider relevant political and social circumstances. *Alfrey*, 276 F.3d at 565.

The discretionary function exception does not apply, however, if the investigators violated a legal mandate. *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004). The discretionary function only applies if the "decision made is a permissible exercise of policy judgment." *Conrad v. United States*, 447 F.3d 760, 765 (9th Cir. 2006). Thus, if an officer violates the constitution or a statute during his or her investigation, that action is not protected by the discretionary function exception.

## 3.      False Imprisonment

Al-Kidd premises his claim for false imprisonment upon the same theory utilized to hold the FBI Agents liable—that the arrest warrant was invalid because the supporting affidavit contained misrepresentations, and a corrected affidavit was not supported by probable cause. The Government counters that there was probable cause to arrest al-Kidd pursuant to the warrant.

To be liable for false imprisonment in Idaho, a person must unlawfully restrain the physical liberty of another without adequate legal justification or without probable cause. *Clark v. Alloway*, 170 P.2d 425, 428 (Idaho 1946). In its September 18, 2006 Memorandum Order deciding the United States' motion to dismiss, the District Court concluded that the Idaho Supreme Court would recognize al-Kidd's false imprisonment claim premised upon the agents' misstatements and omitted information to obtain the arrest warrant. (Mem. Order at 7, Dkt. 78.) In its June 18, 2012 Report and

REPORT AND RECOMMENDATION - 19

Recommendation the Court concluded that Agent Gneckow was not entitled to qualified immunity for his role in procuring the warrant. (*See* Dkt. 336) Agent Gneckow drafted the affidavit prior to presenting it to AUSA Lindquist, and Agent Gneckow decided what information to include and exclude from the affidavit. The Court found that Agent Gneckow's failure to conduct even a cursory investigation into the facts and circumstances of al-Kidd's travel, and the resulting affidavit, was reckless. The Court therefore recommended that al-Kidd's motion for summary judgment be granted and the Government's motion be denied as to Agent Gneckow's liability.[9]

At the hearing, the Government asserted that a lack of probable cause would not necessarily result in a finding for al-Kidd on his false imprisonment claim, considering Idaho law requires the Court to examine whether al-Kidd's arrest occurred "without probable cause." *Clark v. Alloway*, 170 P.2d 425, 428 (Idaho 1945). The Government relies upon *State v. Gomez*, 172 P.3d 1140, 1145 (Idaho 2007), for its argument that the Court must to determine whether "the facts available" to Agent Gneckow "warranted a person of reasonable caution to believe that the action taken [seeking the material witness warrant] was appropriate." The Government argues that, at the time Agent Gneckow prepared the warrant, he knew money had been given to al-Kidd by al-Hussayen; trial was to begin on April 15, 2003; al-Kidd had left his apartment; and al-Kidd was boarding a plane on a first class, one way ticket that cost $5,000.

---

[9] An officer may not cleanse a transaction by supplying only those facts favorable to the issuance of a warrant. *Bender v. City of Seattle*, 664 P.2d 492, 500 (Wash. 1983). The Court concluded that the affidavit was highly suggestive precisely because of the facts Agent Gneckow chose, consciously or not, to include in the affidavit. Further, the Court found that the lack of any investigation by Agent Gneckow to verify the facts he received was reckless. Agent Mace, however, had no role in drafting the warrant, and was not in a position to fully know the underlying facts presented in the application and affidavit.

However, the Court found that Agent Gneckow's conduct in failing to probe further into the reasons for al-Kidd's trip and the particulars of his plane ticket, when he had the means and opportunity to do so given al-Kidd had cooperated in the past, was reckless considering the breadth of the investigation up to that time. In that regard, Agent Gneckow did not exercise reasonable caution. He failed to ask any follow-up questions of the FBI Agent at Dulles Airport, and based his decision solely upon the fact that al-Kidd was leaving for Saudi Arabia with trial one month away. Consequently, the resulting affidavit was highly suggestive of illicit criminal activity and a motive to flee.

Moreover, *State v. Gomez* is factually distinguishable. There, the court considered the officer's reasonableness at the time of conducting a warrantless search, given the information available to the officers at that moment. Here, in contrast, Agent Gneckow had conducted a three year investigation, which included surveillance of and interviews with al-Kidd. Agent Alvarez informed Agent Gneckow about al-Kidd's plane ticket on March 13, 2003, the warrant was presented to the Court on March 14, 2003, and al-Kidd was arrested at Dulles National Airport on March 16, 2003, a span of three days versus an on the spot assessment.

Not only did Agent Gneckow have information from his prior investigative inquiries into al-Kidd's relationship with al-Hussayen and his familial ties to the United States, which he failed to include in the affidavit, he had three days to conduct follow up. But Agent Gneckow could not recall the steps taken to confirm al-Kidd was not at his apartment in Kent, Washington. When he called the FBI agent at Dulles Airport to inquire about al-Kidd's plane ticket, he asked no questions. Had he done so, he might

**REPORT AND RECOMMENDATION - 21**

have learned the truth about the plane ticket,[10] prompting him to doubt his initial assumption that al-Kidd was fleeing the country. Further, agent Gneckow knew al-Kidd had a wife and son, as well as other family, in the United States but never thought to call them. Agent Gneckow cannot absolve himself of his responsibility to conduct follow-up under the circumstances, and therefore did not exercise reasonable caution.

Moreover, excusing an officer's lack of follow up in the context of this matter, considering the ease in which it could have been accomplished, would be to shield the officer from liability when the exigencies of the situation are not the same as those that exist for a warrantless search. During a warrantless search, the officers have limited information and little time at their disposal to make a probable cause assessment. In contrast, Agent Gneckow had the results of a three year investigation, and three days within which to confirm his initial assumption that al-Kidd was fleeing the country. To excuse Agent Gneckow's lack of follow up in this matter would be akin to sanctioning an officer's failure to conduct an adequate investigation before seeking a warrant.

The Court therefore concludes that al-Kidd is entitled to summary judgment on his false imprisonment claim based upon Agent Gneckow's conduct.[11]

---

[10] The Government objected to the information about al-Kidd's travel plans on relevance grounds. (Defs.' Response ¶ 11-13, Dkt. 322-1.) However, the information about al-Kidd's travel plans, their purpose, and the time al-Kidd spent to make arrangements to travel to Saudi Arabia is relevant. Although Agent Gneckow did not know the information at the time, it is his lack of follow up, which could have revealed the information, that is material, and therefore the information is relevant.

[11] The Court requested that the District Court conduct a de novo review of al-Kidd's claim that the warrant application and affidavit was facially defective as it pertains to the claims against Agent Mace. If the District Court concludes that the warrant was not facially defective under *Malley v. Briggs*, 475 U.S. 335 (1986), then al-Kidd's false imprisonment claim against Agent Mace would fail. Agent Mace could be held liable depending on the determinations made by the District court following its de novo review.

**REPORT AND RECOMMENDATION - 22**

## 4.     Abuse of Process

Al-Kidd alleges that the Government misused the material witness statute to detain him preventatively, to investigate him criminally, or both, instead of to secure him as a witness, and contends that the material witness statute may not constitutionally be used to arrest a cooperative witness. Al-Kidd argues that, although the agents disclaim the warrant was used for a purpose other than to secure testimony, the objective evidence in the record supports his position that he was the subject of an investigation until 2004, well after his arrest. He relies upon the FBI's investigation sheets and memoranda, which includes a docketing document identifying al-Kidd as an individual suspected of international terrorism; FBI Director Meuller's testimony before Congress that al-Kidd's arrest was an example of the government's success in combating terrorism; the facts and circumstances surrounding his arrest and subsequent conditions of incarceration during transport to Idaho; a draft of a search warrant seeking permission to examine the contents of al-Kidd's laptop computer, which stated that it may yield "evidence" of criminal activity "as to … al-Kidd;" the Government's position at al-Kidd's detention hearing that al-Kidd was "dangerous;" and lastly, the Government's failure to call al-Kidd as a witness at the al-Hussayen trial and its failure to have al-Kidd's release conditions removed.

The Government, on the other hand, argues that al-Kidd was arrested because the undisputed facts establish that the material witness statute was used properly to secure the material testimony of a witness who was a flight risk. It relies upon the testimony of Agent Gneckow, as well as the prosecutor in the al-Hussayen trial, AUSA Kim Lindquist. The Government acknowledges that al-Kidd was the subject of an FBI investigation, but

argues that fact does not lead to an inference that al-Kidd was arrested because of the investigation. And it argues that the way others in the government viewed him, such as Director Meuller, is irrelevant because al-Kidd's claims are limited to the conduct of Agents Mace and Gneckow. Finally, the Government contends al-Kidd's constitutional theory---that the material witness statute cannot be used except to arrest an uncooperative witness---is without legal foundation.

### A.    Evidentiary Objection

At the hearing, the Government raised an evidentiary objection under Fed. R. Evid. 803(6) to the admission of Exhibit A (Dkt. 309-2 at 2, filed under seal), a docketing document with a list of names of individuals suspected of "International Terrorism," which list included al-Kidd and al-Hussayen. Although AUSA Lindquist was not familiar with the actual document, he identified it as a docketing document from the U.S. Attorney's Office, and explained that docketing documents reflect the creation of a file in the U.S. Attorney's Office. He further explained that a docketing document would be received by the U.S. Attorney's office from the investigating agency to evaluate potential prosecution of the individuals named. (Lindquist Depo. at 49—54, Dkt. 308-4 at 237—242.)

Fed. R. Civ. P. 56(c)(2) permits parties to object to material cited to support or dispute a fact if it cannot be presented in a form that would be admissible in evidence. *See  Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (affirming consideration of hearsay contents of the plaintiff's diary on summary judgment because at trial, the plaintiff's testimony of contents would not be hearsay). Fed. R. Evid. 803(6) allows records of regularly conducted business activities to be admitted as evidence provided the

record was made at or near the time by, or from information transmitted by, someone with knowledge; the record was kept in the course of a regularly conducted activity of a business or organization; making the record was a regular practice of that activity; these conditions are shown by the testimony of the custodian or another qualified witness; and there are no indicia of untrustworthiness.

The docketing document is admissible for purposes of summary judgment under Rule 56(c)(2), because the document would be admissible at trial. Although AUSA Lindquist was not familiar with the particular document, he identified that "docketing documents" are regularly submitted by agencies to the U.S. Attorney's Office for further evaluation, and for the purpose of opening a file. Presuming al-Kidd could obtain the testimony of the custodian or author of the document, or both, the docketing document would be admissible in evidence at trial. Therefore, the Government's objection to the document's admissibility for purposes of summary judgment is denied.

### B.      Analysis

Under Idaho law, the elements of an abuse of process claim are "(1) an ulterior, improper purpose; and (2) a willful act in the use of process not proper in the regular conduct of the proceeding." *Beco Constr. Co., Inc v. City of Idaho Falls*, 865 P.2d 950, 954 (Idaho 1993). It is sufficient if the acting party had *an* ulterior, improper purpose, but it is unnecessary for the improper purpose to be the primary purpose. *Beco Constr. Co., Inc.*, 865 P.2d at 954—55. The Idaho Supreme Court recently explained that "[t]he ulterior motive or purpose generally required in an abuse of process action may take the form of coercion to obtain a collateral advantage not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the

process as a threat or a club...." *Berkshire Investments, LLC v. Taylor*, Case No. 38599,

2012 WL 1970066 *9 (June 1, 2012) (quoting Am.Jur.2d, *Abuse of Process* §6 (2012)).[12]

In an historic case from 1919, *Barton v. Woodward*, 182 P. 916 (Idaho 1919), the

Idaho Supreme Court explained the rationale behind an abuse of process claim involving

a criminal prosecution. "[A] person seeking to accomplish some collateral or ulterior

purpose will act upon much less convincing evidence than one whose only purpose is to

promote the public good. . . the attempt to use the machinery provided for the

enforcement of the law to accomplish and cloak some private collateral or ulterior

purpose" is not permitted. *Barton*, 182 P. at 918—919

Despite the Government's protest that no one at the Department of Justice or FBI

Headquarters in Washington, D.C., contributed to the decision by Agent Gneckow and

AUSA Kim Lindquist to seek the warrant to secure al-Kidd's testimony at trial, the

circumstantial evidence supports the inference that al-Kidd may have been detained for

reasons in addition to securing his testimony at trial. The statements of Director Meuller

before Congress just days after al-Kidd's arrest, together with the docketing document

unambiguously identifying al-Kidd as a suspected terrorist, the draft search warrant, and

the prosecution's characterization of al-Kidd as "dangerous," provide evidence that the

Government regarded al-Kidd as perhaps more than a material witness. And although the

Government represents al-Kidd was a "flight risk," the unrefuted evidence established al-

Kidd was on his way to Saudi Arabia to further his religious studies, not fleeing the

United States to avoid testifying at the al-Hussayen trial. Finally, the brutal conditions of

---

[12] The opinion cited herein has not been released for official publication, and until released, is subject to revision or withdrawal.

**REPORT AND RECOMMENDATION - 26**

al-Kidd's confinement during his sixteen days of incarceration while on his way to Idaho led Justice Ginsberg to question the arguably legitimate basis upon which the Government relies. *See Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2089 (2011) (J. Ginsberg, Concurrence.) If Justice Ginsberg drew conclusions from the circumstantial evidence supporting an ulterior, improper motive, so too, could a jury.

The Court finds that there are material issues of disputed fact that preclude summary judgment for either the United States or al-Kidd. A fact-finder could believe the testimony of AUSA Lindquist and Agent Gneckow that they never considered al-Kidd as a criminal suspect and their sole purpose in obtaining the material witness warrant was to assure his testimony and presence at trial, and not to use the material witness warrant for ulterior purposes. On the other hand, a fact-finder could conclude from all of the circumstances that the Government wanted to detain al-Kidd while they pursued a criminal investigation of his conduct. Because the facts are conflicting, it is not for the Court to decide the matter on cross-motions for summary judgment.

As for al-Kidd's argument that the material witness statute may not be used to arrest a cooperative witness, the Court declines to address the argument at this time, considering disputed facts exist which preclude the grant of summary judgment to either party with respect to al-Kidd's primary claim that the warrant was used for an improper purpose. *See Ashcroft v. al-Kidd*, 131 S.Ct. at 2086 (noting that the Supreme Court's holding left unresolved whether material witness arrests in general were consistent with constitutional requirements).

## CONCLUSION

Based upon the above analysis, the Court recommends that al-Kidd's motion for summary judgment be granted in part and denied in part, and the Government's motion denied. Given the Court's determination that there were material omissions and false statements in the application and affidavit utilized to seek the warrant, the Court recommends that al-Kidd's motion for summary judgment on his false imprisonment claim based upon Agent Gneckow's reckless conduct be granted and the Government's motion denied. However, there remain triable issues of material fact concerning al-Kidd's claim for abuse of process that cannot be resolved on cross-motions for summary judgment by the parties.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

    1)   Plaintiff's Motion for Summary Judgment Against the United States (Dkt. 308) be **DENIED IN PART AND GRANTED IN PART**.

    2)   Defendant United States Motion for Summary Judgment (Dkt. 307) be **DENIED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **June 26, 2012**

Honorable Mikel H. Williams
United States Magistrate Judge

**REPORT AND RECOMMENDATION - 29**